## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARIA M. KIAKOMBUA
T. Don Hutto Residential Center
1001 Welch Street
Taylor, TX 76574;

Plaintiff,

– versus –

KEVIN K. MCALEENAN, in his official capacities as
Acting Secretary of Homeland Security & Commissioner
of United States Customs and Border Protection,
c/o United States Department of Homeland Security
3801 Nebraska Ave, NW
Washington, DC 20016;

WILLIAM P. BARR, in his official capacity as Attorney
General of the United States,
c/o United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530;

KENNETH T. CUCCINELLI, in his official capacity as
Acting Director of United States Citizenship and
Immigration Services,
c/o United States Department of Homeland Security
3801 Nebraska Ave, NW
Washington, DC 20016; *and*

JENNIFER HIGGINS, in her official capacity as
Associate Director of Refugee, Asylum & International
Operations,
c/o United States Department of Homeland Security
3801 Nebraska Ave, NW
Washington, DC 20016;

Defendants.

**Case No.** 1:19-CV-1872

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      This is a case about upholding the American commitment to treat fairly the asylum claims of people, including children, who arrive at our borders fleeing persecution and violence. On April 30, 2019, in yet another attempt to circumvent this commitment, the Trump Administration issued a policy document (the "Lesson Plan") to asylum officers who participate in the "credible fear" screening process—a process that Congress mandated in order to ensure that the United States is not summarily removing people who might have bona fide asylum claims to countries where they face persecution or torture.  This Lesson Plan violates the letter and the spirit of the Immigration and Nationality Act ("INA"), the Refugee Act, the Convention Against Torture ("CAT"), the Administrative Procedure Act ("APA"), and the Constitution.

2.      The United States has long been committed to providing refuge to those fleeing violence and persecution, and Congress codified that commitment in the Refugee Act of 1980, which declares it to be "the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands."  Refugee Act of 1980, § 101(a), Pub. L. No. 96-212, 94 Stat. 102.

3.      Even in amending the INA in 1996 to permit immigration officers to summarily expel certain noncitizens from the United States on an expedited basis, Congress was careful to honor our country's historic commitment to those seeking safe harbor by creating a screening process to ensure that anyone who might be eligible for asylum or related forms of humanitarian protection would avoid expedited removal and have full access to the immigration and federal court systems to make their claims.  This "credible fear" assessment was deliberately designed to be a permissive standard to safeguard against the United States returning displaced people to

dangerous conditions they fled, because doing so contravenes international and domestic law obligations.

4.       Since taking office, however, President Trump and his Administration have pursued an explicitly nativist agenda of closing the borders to asylum seekers without regard to our national commitments, including those enshrined in law.

5.       Most relevant to this case, the Administration has expressly adopted the goal of dramatically reducing the rate at which asylum seekers pass the initial, threshold "credible fear" screening step—the *only* avenue through which they can apply for humanitarian protection—so as to facilitate their expeditious return to the violence and persecution they fled.

6.       In furtherance of the Administration's goal of turning away more asylum seekers, on April 30, 2019, Defendants issued a new policy document in the form of a "Lesson Plan" to the hundreds of asylum officers who conduct these screenings.  The Lesson Plan instructs the officers in a manner that is contrary to the governing statutes and regulations and substantially—and unlawfully—narrows access to the immigration and federal court systems.

7.       Among other things, the Lesson Plan improperly raises the asylum seeker's evidentiary burden; shifts to asylum seekers burdens actually borne by the government; and converts what is supposed to be a nonadversarial, threshold screening into a biased and adversarial hearing through which asylum officers are to apply erroneous legal standards to decide ultimate issues that are supposed to await adjudication by the immigration courts.

8.       Plaintiff Maria M. Kiakombua is one of the asylum seekers at imminent risk of deportation because of the Lesson Plan issued on April 30, 2019.  She fled her home in Angola to escape her boyfriend, a member of the country's military, who beat her—sometimes with a machete—and threatened to kill her if she left him.  Because of his government connections, she

also suffered repeated attacks, including rape, at the hands of government officials. She reached the U.S. border and sought asylum, but an asylum officer found that she lacked a credible fear under the Lesson Plan. She seeks a declaration that the Lesson Plan violates the INA, the Refugee Act, the CAT, the APA, and the Due Process Clause; an order enjoining this unlawful directive so that she and others may have a fair opportunity to present their claims for humanitarian relief through the system Congress created; and an order that her expedited removal order be vacated and that she be provided, at a minimum, with a new credible fear process under the proper legal standard.

9.    Absent injunctive relief from this Court, Ms. Kiakombua and thousands more who, like her, are desperately seeking safety will be unlawfully deported to their countries of origin to face rape, beatings, death, and other forms of persecution.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction under 8 U.S.C. § 1252(e)(3), which permits review in the United States District Court for the District of Columbia of "a written policy directive, written policy guideline, or written procedure" implementing the expedited removal statute. This Court also has subject matter jurisdiction under 28 U.S.C. § 1331.

11.    Venue is proper in this District because 8 U.S.C. § 1252(e)(3) requires actions brought thereunder to be filed in the United States District Court for the District of Columbia. Venue is also proper pursuant to 28 U.S.C. § 1391(e)(1) because, on information and belief, a substantial part of the events or omissions giving rise to the Complaint occurred within the District of Columbia.

## THE PARTIES

12.     Plaintiff Maria M. Kiakombua is a citizen of Angola detained in the custody of the Department of Homeland Security at the T. Don Hutto Residential Center in Taylor, Texas.  She was forced to flee Angola because of harm she faced and feared would continue at the hands of her boyfriend, who is in the military, and other government officials.  Over the course of two years, Ms. Kiakombua's boyfriend beat her, sometimes with a machete, and threatened to kill her if she left him.  Ms. Kiakombua was hospitalized at least once because of the injuries she suffered.  In addition, on more than one occasion, government officials associated with Ms. Kiakombua's boyfriend came to her home and raped her in the presence of her children, due in part to her failure to abide by societal norms regarding the proper role and behavior of women.  They also beat her children and broke her son's arm.  After fleeing Angola, Ms. Kiakombua came to the United States seeking protection in April 2019.

13.     In May 2019, an asylum officer determined—pursuant to a credible fear process governed by the unlawful standards and procedures contained in the Lesson Plan—that Ms. Kiakombua lacked a credible fear of persecution or torture.  An immigration judge subsequently agreed.  Ms. Kiakombua sought reconsideration from the asylum officer, but that, too, was denied.  Ms. Kiakombua is at imminent risk of removal to her home country.

14.     Defendant Kevin K. McAleenan is sued in his official capacities as Acting Secretary of Homeland Security and Commissioner of Customs and Border Protection.  In his capacity as Acting Secretary, Defendant McAleenan is charged with the administration and enforcement of the immigration laws and leads the Department of Homeland Security ("DHS") and its component agencies.  These components include United States Citizenship and Immigration Services ("USCIS"), which employs asylum officers, and Customs and Border

Protection ("CBP").  In his capacity as CBP Commissioner, he oversees the work of CBP officers, including Border Patrol agents, who, on information and belief, are or soon will be conducting credible fear screenings.

15.     Defendant William P. Barr is sued in his official capacity as Attorney General of the United States.  In this capacity, Defendant Barr is charged with the administration and enforcement of the immigration laws and leads the Department of Justice, which oversees the immigration courts. The immigration courts have jurisdiction to review credible fear determinations by asylum officers.

16.     Defendant Kenneth T. Cuccinelli is sued in his official capacity as Acting Director of USCIS.  In this capacity, he oversees the work and training of asylum officers who conduct credible fear screenings.

17.     Defendant Jennifer Higgins is sued in her official capacity as Associate Director of Refugee, Asylum and International Operations ("RAIO") for USCIS.  RAIO is responsible for supervising and training asylum officers, including through policy documents such as the Lesson Plan.

## BACKGROUND

### Rights of Asylum Seekers and Limits on the Executive's Removal Authority

18.     Congress has enshrined in U.S. law special protections for individuals fleeing persecution or torture, consistent with the humanitarian commitments of the United States under treaties including the 1967 Protocol Relating to the Status of Refugees and the Convention Against Torture.

19.     In enacting the Refugee Act in 1980, Congress "declare[d]" that the Act's purpose was to codify "the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands." § 101(a), 94 Stat. 102.

20.     Consistent with that historic commitment, *all* noncitizens at or within U.S. borders generally have a right to apply for asylum—a form of protection available to individuals who can prove that they are "refugee[s]" within the meaning of the INA for having suffered persecution in the past or having a "well-founded fear" of persecution in the future.

21.     Other provisions of U.S. law prohibit the government from removing noncitizens to countries where they face persecution or torture, even if they are not granted asylum. *See* 8 U.S.C. § 1231(b)(3); Convention Against Torture, Art. 3; 8 C.F.R. § 208.16(c), (d).  Rather, when appropriate, the government must grant the noncitizens protection in the form of withholding of removal under the INA, *see* 8 U.S.C. § 1231(b)(3), or withholding or deferral of removal under the CAT, *see* 8 C.F.R. § 208.16(c)(4).

**Expedited Removal and the Credible Fear Screening Safeguard**

22.     Before 1997, any noncitizen that the federal government wished to remove from the United States generally was entitled to a full hearing before an immigration judge, with opportunities to challenge the alleged grounds for her removal and to apply for relief from removal, including asylum.

23.     With the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, which went into effect in 1997, Congress created an expedited removal system through which immigration officers outside the judicial system may order removed certain noncitizens without providing them an opportunity to apply for relief from removal, and "without further hearing or review."  8 U.S.C. § 1225(b)(1)(A)(i); *see also id.* § 1225(b)(1)(B)(iii)(I).

24.     Reflecting our country's commitment to asylum seekers, however, and to avoid the possibility of unlawfully and inhumanely sending individuals back to persecution, Congress took care to ensure that any noncitizen who "indicate[d] either an intention to apply for asylum under [8 U.S.C. § 1158] or a fear of persecution" would be accorded more process before they could be removed—including, potentially, a full hearing before an immigration judge and subsequent review by the Board of Immigration Appeals and federal appellate courts. 8 U.S.C. § 1225(b)(1)(A)(i); 8 C.F.R. § 208.30(f).

25.     Thus, if noncitizens in the expedited removal system indicate that they intend to apply for asylum or fears persecution, immigration officers are required to refer them for interviews before asylum officers to determine if they have a "credible fear of persecution." 8 U.S.C. § 1225(b)(1)(B)(ii); *see also id.* § 1225(b)(1)(A)(ii). Throughout the credible fear screening process, the asylum seekers are subject to mandatory detention. *Id.* § 1225(b)(1)(B)(iii)(IV).

26.     If an asylum officer determines that an asylum seeker has a "credible fear of persecution," the officer must refer the case to immigration court for a full hearing on whether the individual is subject to removal in the first place and, if so, whether the asylum seeker is eligible for protection such as asylum. If, after the hearing and any appeals, the asylum seeker is found to be removable and ineligible for protection, he or she is removed. *See* 8 U.S.C. §1225(b)(1)(B)(ii); 8 U.S.C. § 1229a; 8 C.F.R. § 208.30(f).

27.     Since the adoption in 1999 of regulations implementing the Convention Against Torture—which bars the government from removing noncitizens to countries where they will be tortured—the credible fear safeguard has applied also to those who indicate a fear of torture and are deemed to have a "credible fear of torture." 8 C.F.R. § 208.30(e), (f).

28.     When asylum officers determine that asylum seekers do not have a credible fear of persecution or torture, they are ordered removed "without further hearing or review."  8 U.S.C. § 1225(b)(1)(B)(iii)(I).

29.     At this stage, asylum seekers may request review by an immigration judge, but the judge's review is limited to assessing the credible fear determination.  If the immigration judge affirms—which is typically done through a checkbox form, with no explanation—the individuals are removed.  With few exceptions, there is no statutory or regulatory right to further review of this crucial gatekeeping function.     *See* 8 U.S.C. § 1225(b)(1)(B)(iii);  8 C.F.R. § 1208.30(g)(2)(iv)(A), (B).

## Conduct of Credible Fear Screenings

30.     Congress designed the credible fear standard to enable asylum officers to quickly screen out frivolous asylum claims while permitting those that are potentially meritorious to be adjudicated by immigration judges.

31.     In doing so, Congress created what the Department of Justice has recognized as a "low threshold of proof of potential entitlement to asylum," 62 Fed. Reg. 10,312, 10,320 (Mar. 6, 1997).  As provided in the governing statute, "the term 'credible fear of persecution' means that there is a significant *possibility*, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien *could establish* eligibility for asylum under [8 U.S.C. § 1158]."  8 U.S.C. § 1225(b)(1)(B)(v) (emphases added); *see also* 8 C.F.R. § 208.30(e) (same).

32.     Reflecting its purpose and the circumstances of those who have just arrived at our borders fleeing violence and other forms of persecution, the interview must be conducted "in a nonadversarial manner," with the asylum officer required "to elicit all relevant and useful

information bearing on whether the applicant has a credible fear of persecution or torture."  8 C.F.R. § 208.30(d).

33.    Asylum officers must receive special training in "international human rights law, nonadversarial interview techniques, and other relevant national and international refugee laws and principles."  8 C.F.R. § 208.1(b).

34.    At the credible fear stage, the asylum officer's mandate is not to adjudicate the claim (or any part thereof) on the merits, but rather to determine—on information that is circumscribed both by statute and by practical considerations—whether the asylum seeker *might* establish eligibility for asylum if given that opportunity through formal removal proceedings.

35.    There is no statutory or regulatory requirement that asylum seekers produce any evidence beyond their own testimony at the credible fear stage.

36.    Nor is the credible fear stage suited to complex factfinding.  Asylum seekers typically are recent arrivals with little to no knowledge of U.S. immigration law, scant opportunity to marshal relevant evidence and even to identify pertinent information, and limited access, if any, to counsel. Many are struggling with the trauma associated with persecution in their home countries and their flight to the United States, as well as trauma and stress associated with their detention by U.S. immigration officials.  The screening, furthermore, is required by law to be nonadversarial.  The asylum officer who makes the determination as to credible fear need not be an attorney.

37.    As a formal matter, the credible fear screening is not considered to be part of the application for asylum, which can be filed as late as a year after the asylum seeker's arrival (or even later in certain circumstances).

### Defendants' Policy to Drive Down the Credible Fear Passage Rate

38.     As a candidate, President Trump ran an explicitly nativist campaign that demonized immigrants and refugees, particularly those who are not (or are not perceived as) white.

39.     Since taking office, President Trump has acted on his nativist promises, making unprecedented policy changes to advance his agenda without any regard for the law or the devastating impact that they would have on the lives of those who come to the United States seeking refuge.

40.     For example, the Trump Administration implemented a widely criticized policy of forcibly separating migrant parents from their children.  Administration officials have admitted that the goal of the separation was to discourage Central American families from traveling to the border and applying for asylum.  The separation policy was challenged as unlawful, and a federal judge granted a classwide preliminary injunction.  *See Ms. L v. U.S. Immigration & Customs Enf't*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018).  The Trump Administration estimates it could take it two more years just to identify thousands of migrant families that it forcibly separated, and even longer to reunify them.

41.     Likewise, in November 2018, the Trump Administration sought to render ineligible for asylum noncitizens who entered the United States outside of a port of entry, in defiance of statutory language explicitly making such individuals eligible.  That policy, too, was preliminarily enjoined.  *See East Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094 (N.D. Cal. 2018).

42.     Most relevant to this case, the Trump Administration has also sought to make it more difficult for those from Central America in particular to pass credible fear screenings and to apply for asylum. These changes were enjoined by a court in this district in *Grace v. Whitaker*, 344 F. Supp. 3d 96 (D.D.C. 2018), *appeal docketed*, No. 19-5013 (D.C. Cir.).

43.     As well as through these policies that have already been enjoined by courts, President Trump has made clear through his words—including materially false and misleading statements about the immigration system—his intent to destroy the asylum system and the credible fear process that Congress mandated.

44.     In fact, the President has personally directed blatantly illegal actions targeting asylum seekers.

45.     In March 2019, President Trump ordered then-Secretary of Homeland Security Kirstjen Nielsen to close the El Paso port of entry and at the very least to deny entry to asylum seekers; Secretary Nielsen refused, and was shortly thereafter forced to resign.

46.     Similarly, in a visit to the United States' southern border in April 2019, President Trump personally directed Border Patrol agents to turn asylum seekers away and to explain to any judge finding fault with that action, "Sorry, judge, I can't do it. We don't have the room."

47.     The President has also repeatedly denigrated asylum seekers without any factual basis, dehumanizing them to the point of comparing them to animals.  President Trump often suggests that people seeking asylum are liars who are "not afraid of anything."  In May 2018, President Trump said of people crossing the Mexican border into the United States: "You wouldn't believe how bad these people are. These aren't people. These are animals."

48.     The President has repeatedly opined that the entire asylum system is fraudulent, ignoring that it is a system created by Congress in compliance with the United States' international obligations.  In April 2019, President Trump repeatedly called the asylum system "a big, fat con job."  Furthermore, just before filing of this suit, President Trump threatened massive immigration raids across the country targeting women and children if Democrats did not work together with

Republicans to find a solution to the "loophole" of migrants fleeing persecution having the right to ask for asylum in this country.

49.     The Executive agencies under the President have also participated in disseminating false information about the asylum system. This spring, the Executive Office for Immigration Review issued a "fact" sheet that, among other things, dismissed as a "myth" the notion that "[m]ost aliens who claim a credible fear of persecution have meritorious asylum claims."  In response to the "fact" sheet, the National Association of Immigration Judges issued a press release declaring the document to be "filled with errors and misinformation."

50.     Similarly, a group of retired immigration judges and retired members of the Board of Immigration Appeals wrote an open letter to the Director of the Executive Office for Immigration Review that condemned the "fact" sheet as "political pandering, at the expense of public faith in the immigration courts," for presenting "imagined 'myths' and wildly inaccurate and misleading information labeled as 'fact.'"  True "American courts," they cautioned, "do not issue propaganda implying that those whose cases [they] rule[] on for the most part have invalid claims[,] . . . or that those unable to surmount the government-created obstacles to filing asylum applications are somehow guilty of deceit."  "Such statements," they continued, "indicate a bias which is absolutely unacceptable and, frankly, shocking."

51.     With recent changes in Administration staff, Defendants have renewed their focus on credible fear screenings, making it a priority to drive down the rate at which asylum seekers pass the screenings and avoid summary deportation.

52.     Indeed, Defendant McAleenan and Defendant Cuccinelli were recently tapped to lead DHS and USCIS, respectively, for their willingness to take more aggressive stances than their predecessors to restrict applications for humanitarian relief.

53.     Shortly after assuming his role, Defendant Cuccinelli admonished USCIS staff to do "[their] part to help stem the crisis and better secure the homeland" when conducting credible fear screenings.  His message was considered by many who received it to be a thinly veiled threat that asylum officers would be blamed for the Administration's failings if the credible fear passage rate did not materially drop.

54.     In a further effort to lower the credible fear passage rate, Defendants have also begun recruiting CBP officers, who are expected to be more "aggressive" with asylum seekers at the border, to conduct credible fear screenings.

55.     On April 9, 2019, a senior Administration official reported that the Administration would be implementing policy changes to make it more difficult for those asserting a fear of persecution or torture to access the U.S. immigration and federal court systems.  Regarding credible fear screenings, the official said that asylum officers would "apply greater rigor and scrutiny to . . . [asylum] claims," and suggested that DHS might mobilize assistance from the Department of State in order to further drive down the credible fear passage rate.

**The Lesson Plan**

56.     On April 30, 2019, the USCIS RAIO Directorate issued a final written "Lesson Plan" on "Credible Fear of Persecution and Torture Determinations."

57.     The Lesson Plan is a policy document that controls the conduct of asylum officers in credible fear screenings.

58.     When promulgating regulations on the expedited removal process, the Department of Justice declined to elaborate on the standard, reasoning that asylum officer training—founded on documents like the Lesson Plan—would be "extensive" in order to control how the credible fear standard was "applied to particular cases" and to "ensure that the standard [wa]s implemented

in a way which w[ould] encourage flexibility and a broad application of the statutory standard," consistent with Congress' aim.  62 Fed. Reg. 10,312, 10,317 (Mar. 6, 1997).

59.     Here, however, the Lesson Plan executes Defendants' policy to drive down the credible fear passage rate by directing asylum officers to conduct interviews in a manner that is contrary to the statutory scheme, binding regulations, judicial precedent, and longstanding practice.  It does so in myriad ways.

60.     For example, the Lesson Plan effectively converts the credible fear determination from an inquiry into whether an asylum seeker *could* establish eligibility for relief in the future into an adjudication on whether the asylum seeker actually *has* established eligibility.

61.     Throughout the Lesson Plan, Defendants suggest that the asylum seeker's ability to succeed on a credible fear determination will hinge on her ability to fully establish eligibility for relief in all of its intricacies.  Among other things, the Lesson Plan:

   a. requires the asylum seeker to identify specific facts sufficient to establish eligibility for asylum in order to be found credible, even if such facts are not and would not be expected to be within the asylum seeker's knowledge;

   b. requires the asylum seeker to establish "a significant possibility of future persecution," when the credible fear standard merely requires a significant possibility of establishing eligibility, and even the substantive asylum standard requires only a "*well-founded fear* of persecution"; and

   c. otherwise fails to describe the relevant asylum standards according to the controlling question of whether the asylum seeker has a significant possibility of meeting those standards in the future.

62.     The Lesson Plan also increases the evidentiary burden the asylum seeker must carry to pass a credible fear screening by, among other things, imposing an unlawful corroboration requirement; requiring the asylum seeker to present "more than 'significant evidence'" of eligibility, contrary to the applicable standard; unlawfully prohibiting asylum officers from making allowances for special circumstances—such as trauma, the passage of time, or cultural

considerations—that may make it difficult for the asylum seeker to present her story in the setting of the credible fear screening; and placing the onus on the asylum seeker to produce testimony that is in fact the officer's duty to elicit.

63.    Relatedly, the Lesson Plan turns what the law requires to be a nonadversarial interview into an adversarial process that is biased against the asylum seeker, with the asylum officer functioning at once as opponent and arbiter.  Among other things, the Lesson Plan:

   a. requires—in contravention of binding regulations—asylum officers to measure the asylum seeker's statements against information in Department of State-issued reports that the current Administration recently revised to remove accurate information helpful to asylum seekers, and to treat the reports as "objective" fact;

   b. instructs asylum officers—in contravention of law—that they need not provide the asylum seeker with an opportunity to address concerns that might lead to a negative credibility determination; and

   c. encourages asylum officers to find ways to use prior statements to Border Patrol to impeach the asylum seeker.

64.    In addition, Lesson Plan misrepresents the substantive law to be applied in the credible fear process, and in ways that prejudice applicants.  For example, the Lesson Plan:

   a. doubles down on an erroneous construction of private actor persecution that was enjoined by *Grace v. Whitaker*, 344 F. Supp. 3d 96, 107 (D.D.C. 2018), by instructing that "the government [in the asylum seeker's country of origin] must have abdicated its responsibility to control persecution" for harm due to actions of a private actor to constitute persecution;

   b. shifts what is the government's burden to the asylum seeker in resolving certain issues relating to past persecution and humanitarian asylum; and

   c. mischaracterizes controlling Supreme Court and other case law so that asylum officers will determine that no credible fear exists, when a faithful application of the law would (or at the very least could) lead to the opposite result.

65.    The Lesson Plan is problematic as well for what it omits from previous guidance, without explanation or even acknowledgment.  For example, the Lesson Plan omits the regulation-based instruction that "novel or unique issues . . . merit consideration in a full hearing before an

immigration judge" even if a negative credible fear determination might otherwise seem warranted, 8 C.F.R. § 208.30(e)(4); omits instruction in other applicable law and procedure that is helpful to the asylum officer and favorable to the asylum seeker; and otherwise modifies longstanding guidance to artificially and unlawfully achieve the Administration's aim of decreasing the number of individuals who pass credible fear screenings.

66.     In sum, the Lesson Plan is not a good-faith attempt to provide guidance to the hundreds of asylum officers tasked with the life-and-death responsibility of screening out frivolous protection claims from the rest, but a biased, error-filled set of instructions designed to turn back as many asylum seekers as possible.  This is not the system Congress designed.

## FIRST CLAIM FOR RELIEF
### (Refugee Act, Immigration and Nationality Act, Convention Against Torture, & Administrative Procedure Act)

67.     All the foregoing allegations are repeated and realleged as though fully set forth herein.

68.     Pursuant to 8 U.S.C. § 1252(e)(3), this Court's review is available to determine whether the Lesson Plan is "consistent with applicable provisions of [Subchapter II of the INA] or is otherwise in violation of law."

69.     The APA provides that a Court "shall hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).

70.     The Refugee Act provides that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival …), irrespective of such alien's status, may apply for asylum."  8 U.S.C. § 1158(a).

71.     Defendants are prohibited from removing individuals to a country where they will be persecuted, *see* INA, 8 U.S.C. § 1231(b)(3); or tortured, *see* Convention Against Torture, Art. 3; 8 C.F.R. § 208.16(c), (d).

72.     The credible fear policies contained in the Lesson Plan violate the INA, the Refugee Act, and the CAT; are arbitrary and capricious; and are contrary to law.

73.     Among other reasons, the credible fear policies contained in the Lesson Plan conflict with the statutory credible fear standard and process; conflict with various regulatory provisions governing the credible fear standard and process, including as it relates to the CAT; represent departures from longstanding agency policy without so much as an acknowledgment of those departures, much less reasoned explanations therefor; are illogical, irrational, legally erroneous, and fail to adequately take into account all relevant factors; and deprive credible fear applicants of a meaningful opportunity to establish their eligibility for asylum and other forms of humanitarian relief.

74.     The Lesson Plan must therefore be held unlawful, set aside, or otherwise vacated.

## SECOND CLAIM FOR RELIEF
### (Administrative Procedure Act)

75.     All the foregoing allegations are repeated and realleged as though fully set forth herein.

76.     The APA requires agency action that is substantive (or "legislative") in nature to follow notice-and-comment procedures.  5 U.S.C. § 706(2)(D).

77.     The Lesson Plan reflects one or more substantive rules, including because it has the force and effect of law and because it conflicts with various regulatory provisions, effectively amending them.

78.     Defendants did not follow notice-and-comment rulemaking procedures related to the Lesson Plan.

79.     The Lesson Plan therefore must be held unlawful and set aside for Defendants' failure to observe the procedure required by the APA.  5 U.S.C. § 706(2)(D).

### THIRD CLAIM FOR RELIEF
**(Due Process Clause of the Fifth Amendment to the U.S. Constitution)**

80.     All the foregoing allegations are repeated and incorporated as though fully set forth herein.

81.     Ms. Kiakombua has a protected interest in applying for asylum, withholding of removal, relief under the CAT, and in not being removed to a country where she faces serious danger and potential loss of life.

82.     Ms. Kiakombua is entitled under the Due Process Clause of the Fifth Amendment to a fair hearing of her claims, and a meaningful opportunity to establish her potential eligibility for asylum and other forms of relief from removal.

83.     The credible fear policies contained in the Lesson Plan violated Ms. Kiakombua's right to due process in numerous ways, including by subjecting her claims to unlawful, more burdensome legal standards, and by depriving her of a meaningful opportunity to establish her eligibility for asylum and other forms of humanitarian relief.

84.     The Lesson Plan must therefore be enjoined as violative of the Fifth Amendment's guarantee of due process.

### PRAYER FOR RELIEF

WHEREFORE, Ms. Kiakombua respectfully requests that this Court:

1.     "[A]dvance on the docket and . . . expedite to the greatest possible extent the disposition" of this case, 8 U.S.C. § 1252(e)(3)(D);

2.      Enter an order staying Ms. Kiakombua's expedited removal;

3.      Enter an order vacating the expedited removal order issued to Ms. Kiakombua;

4.      Declare the Lesson Plan and all related credible fear guidance issued by Defendants on or around April 30, 2019 contrary to law;

5.      Enter an order vacating the Lesson Plan and all related credible fear guidance issued by Defendants on or around April 30, 2019;

6.      Enter an order enjoining Defendants from continuing to apply the Lesson Plan and any related credible fear guidance issued by Defendants on or around April 30, 2019;

7.      Enter an order enjoining Defendants from removing Ms. Kiakombua without first providing her with a new credible fear screening under correct legal standards or, in the alternative, full immigration court removal proceedings pursuant to 8 U.S.C. § 1229a.  If Ms. Kiakombua is removed during the pendency of this case, she requests an order that she be paroled into the United States for the duration of those credible fear and/or removal proceedings;

8.      Award Plaintiff's counsel attorneys' fees and costs pursuant to 28 U.S.C. § 2412, and any other applicable statute or regulation; and

9.      Award such other and further relief that the Court may deem just, equitable, and proper.

Dated:  June 25, 2019                         Respectfully submitted,

                                              /s/ Mariko Hirose
Justin B. Cox*                                Mariko Hirose (D.D.C. Bar No. NY0262)
INTERNATIONAL REFUGEE ASSISTANCE              Kathryn Austin*
PROJECT                                       Deepa Alagesan (D.D.C. Bar No. NY0261)
PO Box 170208                                 INTERNATIONAL REFUGEE ASSISTANCE
Atlanta, GA 30317                             PROJECT
Telephone: (516) 701-4233                     One Battery Park Plaza, 4th Floor
jcox@refugeerights.org                        New York, New York 10004
                                              Telephone: (516) 701-4620
                                              mhirose@refugeerights.org
                                              kaustin@refugeerights.org
                                              dalagesan@refugeerights.org


                                              Manoj Govindaiah (D.D.C. Bar No. TX0145)
                                              Maria Osornio*
                                              REFUGEE AND IMMIGRANT CENTER FOR
                                              EDUCATION AND LEGAL SERVICES
                                              802 Kentucky Ave.
                                              San Antonio, TX 78201
                                              Telephone: (210) 226-7722
                                              manoj.govindaiah@raicestexas.org
                                              maria.osornio@raicestexas.org

                                              *Attorneys for Plaintiff*

                                              *Application for bar or *pro hac vice* admission
                                              forthcoming