# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MARIA M. KIAKOMBUA, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 19-cv-1872 (KBJ) |
| | ) | |
| CHAD F. WOLF, *in his official capacity as* | ) | |
| *Acting Secretary of the Department of* | ) | |
| *Homeland Security, et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION

### TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................1

II.   BACKGROUND ....................................................................................5

    A.  Credible Fear Screenings And The U.S. Asylum Process..................5

    B.  USCIS's "Lesson Plan On Credible Fear Of Persecution And Torture Determinations"....................................................................10

    C.  Plaintiffs' Asylum-Related Experiences .......................................12

        1.  Maria Kiakombua..................................................................13

        2.  "Sofia" and "Julia"..............................................................14

        3.  "Ana" and "Emma" ..............................................................16

    D.  Procedural History ........................................................................17

        1.  Plaintiffs' Legal Claims.........................................................18

        2.  The Parties' Cross-Motions For Summary Judgment .................20

III.  LEGAL STANDARDS .........................................................................24

    A.  Motions To Dismiss Under Federal Rule Of Civil Procedure 12(b)(1) ...........24

B.  Rule 56 Motions For Summary Judgment With Respect To Legal Claims That Assail Agency Action Under The APA And Otherwise...........................26

IV. ANALYSIS.................................................................................................27

A.  Plaintiffs Have Article III Standing To Challenge The Lesson Plan, And Defendants Have Not Established That Plaintiffs' Claims Are Moot .............29

1.  Plaintiffs Suffered An Injury In Fact, Which Is Fairly Traceable To The Lesson Plan, And May Be Redressed By An Order Vacating The Lesson Plan And Requiring New Credible Fear Determinations...............29

2.  Defendants Have Not Persuasively Demonstrated Mootness ....................34

B.  This Court Has Subject-Matter Jurisdiction To Review Agency Action That Allegedly Violates Provisions Of The INA .............................................40

1.  Section 1252(e)(3)(A) Of The INA Preserves This Court's Subject-Matter Jurisdiction Under 28 U.S.C. § 1331 In These Circumstances ...............................................................................................43

2.  Plaintiffs' Claims Are Not Time-Barred ..................................................50

C.  The Lesson Plan Violates The INA And Its Implementing Regulations...........53

1.  The INA And Its Regulations Plainly Establish A Two-Stage Framework To Demonstrate Asylum Eligibility In The Expedited Removal Context, And Provide Standards For Making The Required Assessment At Each Stage Of The Process.................................................55

2.  Certain Provisions Of The Lesson Plan Conflate The Initial Credible Fear Screening Standards With The Requirements For Asylum Eligibility, And Are Thus Manifestly Inconsistent With The INA's Express Prescriptions ...........................................................................60

a.  The Lesson Plan Requires That A Noncitizen "Identify More Than Significant Evidence That The Applicant Is A Refugee Entitled To Asylum" In Order To Pass The Credible Fear Screening ...................60

b.  The Lesson Plan Imports Factors That Are Relevant For Asylum Relief During The Full Removal Proceeding Stage Into The Initial Credible Fear Determination Process................................................62

c.  The Lesson Plan Places A Burden On The Asylum Seeker Who Suffered Past Persecution To Show Unchanged Country Conditions And The Unavailability Of Internal Relocation As Prerequisites For A Favorable Credible Fear Determination....................................65

3.  Certain Provisions Of The Lesson Plan Are Based Upon An Unreasonable Interpretation Of The INA's Asylum Review Process .........67

    a.  The Lesson Plan's Mandate That Noncitizens Provide "Evidence" And "Facts" That Pertain To "Every Element" Of Their Asylum Claim Is Plainly Unreasonable Given The Statutory Requirements .....67

    b.  The Lesson Plan Unreasonably Permits Asylum Officers To Require Corroboration In The Context Of The Credible Fear Interview Process ...........................................................................70

    c.  The Lesson Plan Unreasonably Requires The Screening Officer To Consider Whether The Noncitizen's Home Government Has "Abdicated Its Responsibility" To Control Persecution .....................73

D.  The Unlawful Provisions Of The Lesson Plan Cannot Be Severed From The Remainder Of The Document, So The Court Will Exercise Its Equitable Authority To Vacate The Entire Lesson Plan And Will Also Order New Credible Fear Determinations For These Plaintiffs.........................................76

    1.  Vacatur Is An Appropriate Remedy Under These Circumstances .............78

    2.  The Unlawful Provisions Of The Lesson Plan Are Not Severable From The Remainder Of The Document, Such That Vacatur Of The Entire Lesson Plan Is Required .........................................................87

    3.  Plaintiffs Are Entitled To New Credible Fear Determinations...................92

V.  CONCLUSION ....................................................................................................95

I.      INTRODUCTION

        The Department of Homeland Security ("DHS")—and, in particular, DHS's sub-

agency, the United States Citizenship and Immigration Services ("USCIS")—is tasked

with the responsibility of training federal employees to make sensitive and

consequential judgments concerning the asylum eligibility of noncitizens seeking refuge

in the United States.[1]   Federal law specifically prescribes the substantive standards that

front-line asylum officers apply in order to identify those noncitizens designated for

expedited removal who have a "credible fear or persecution" in their home countries

and are thus entitled to a more probing evaluation of their asylum request in the context

of a full removal hearing.  *See, e.g.*, 8 U.S.C. § 1225(b)(1)(B); 8 C.F.R. § 208.30; *see*

*also* Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"),

Pub. L. No. 104-208, div. C, 110 Stat. 3009-546 (amending 8 U.S.C. § 1101 *et seq.*).

USCIS has also developed a related training course for its screening officers, which

utilizes a manual titled the "Lesson Plan on Credible Fear of Persecution and Torture

Determinations."  (Ex. 1 to Admin. Record ("Lesson Plan"), ECF No. 61-1, at 2–38.)[2]

That document—which the agency colloquially refers to as "the Lesson Plan"—purports

"to explain [to asylum officers] how to determine whether an alien subject to expedited

removal or an arriving stowaway has a credible fear of persecution or torture."  (*Id.* at

2.)  According to USCIS, the Lesson Plan enables asylum officers "to correctly make a

_____

[1] This Memorandum Opinion employs the term "noncitizen" in lieu of the term "alien" to refer to "any person who is not a citizen or national of the United States."  *Pereira v. Sessions*, 138 S. Ct. 2105, 2110 n.1 (2018).  The latter is commonly used in immigration-related statutes and regulations.  *See, e.g.*, 8 U.S.C. § 1101(a)(3).

[2] Page-number citations to the documents that the parties and the Court have filed refer to the page numbers that the Court's Electronic Case Filing ("ECF") system automatically assigns.

credible fear determination consistent with the statutory provisions, regulations, policies, and procedures that govern whether the applicant has established a credible fear of persecution or a credible fear of torture." (*Id.*)

The instant action challenges that proposition. Plaintiffs Maria Kiakombua, Ana, Emma, Sofia, and Julia (collectively "Plaintiffs") are noncitizens subject to expedited removal who allege that, sometime between May and June of 2019, USCIS screening officers made adverse credible fear determinations with respect to each of them pursuant to the Lesson Plan's directives. (*See* Suppl. First Am. Compl. ("Am. Compl."), ECF No. 62-2, ¶¶ 8, 14, 21, 23, 25, 27.) Plaintiffs assert, *inter alia*, that the current version of the Lesson Plan is unlawfully designed "to drive down the rate at which asylum seekers pass the screenings and avoid summary deportation[,]" and that it does so by, among other things, directing asylum officers to make credible fear determinations in a manner that is manifestly inconsistent with the governing statutory and regulatory requirements. (*Id.* ¶ 72; *see, e.g.*, *id.* ¶ 85 ("[T]he Lesson Plan misrepresents the substantive law to be considered by the asylum officer to evaluate potential eligibility for asylum or other humanitarian protection[.]").) For example, according to Plaintiffs, the Lesson Plan "converts the credible fear determination from an inquiry into whether an asylum seeker *could* establish eligibility for relief in the future" (*id*. ¶ 81), as the Immigration and Nationality Act ("INA") provides, *see* 8 U.S.C. § 1225(b)(1)(B)(v), "into an adjudication on whether the asylum seeker actually *has* established eligibility" during the initial screening phase (Am. Compl. ¶ 81). Similarly, Plaintiffs allege that the Lesson Plan "increases the evidentiary burden the asylum seeker must carry to pass a credible fear screening" insofar as it "impos[es] an

unlawful corroboration requirement; requir[es] the asylum seeker to present more than significant evidence of eligibility . . . ; and plac[es] the onus on the asylum seeker to produce testimony that is in fact the officer's duty to elicit." (*Id.* ¶ 83 (internal quotation marks omitted).)

Plaintiffs' three-count lawsuit, which has been filed against the Attorney General, DHS, USCIS, the Refugee, Asylum, and International Operations ("RAIO") Directorate, and United States Customs and Border Protection ("CBP") (collectively, "Defendants"), claims that: (1) the current Lesson Plan is inconsistent with the provisions of certain immigration-related statutes, other federal laws, and customary international law (*see* Am. Compl. ¶¶ 89–98 ("First Claim for Relief")); (2) Defendants failed to follow notice-and-comment rulemaking procedures when they crafted the current Lesson Plan, in violation of the procedural requirements of the Administrative Procedure Act ("APA") (*id.* ¶¶ 99–103 ("Second Claim for Relief")); and (3) as it is currently constituted, the Lesson Plan transgresses the Due Process Clause of the Fifth Amendment to the United States Constitution (*see id.* ¶¶ 104–08 ("Third Claim for Relief")).

Before this Court at present are the parties' cross motions for summary judgment concerning Plaintiffs' legal claims. (*See* Defs.' Mem. in Supp. of Mot. for Summ. J. ("Defs.' Mot."), ECF No. 31-1; Pls.' Mem. in Supp. of Cross-Mot. for Summ. J. and in Opp'n to Defs.' Mot. ("Pls.' Mot."), ECF No. 36-1; Defs.' Mem. of Law in Opp'n to Pls.' Mot. and Reply in Supp. of Defs.' Mot. ("Defs.' Reply"), ECF No. 49; Pls.' Reply Mem. of Law in Supp. of Pls.' Mot. ("Pls.' Reply"), ECF No. 60.)  In their motion, Defendants make a host of threshold arguments, including that Plaintiffs lack Article III

3

standing (*see* Defs.' Mot. at 24), that Plaintiffs' claims are moot (*see* Defs.' Reply at 13), and that the Court does not have subject-matter jurisdiction over the claims in Plaintiffs' pleading (*see* Defs.' Mot. at 30–31). Defendants also contend that "the Lesson Plan is not actionable under either the APA or the INA" (*id*. at 37) and that Plaintiffs' claims fail on the merits in any event (*id.* at 47). Defendants further maintain that, even if the Court finds that Plaintiffs' claims are meritorious, the only available remedy is a declaration that the Lesson Plan is unlawful. (*Id.* at 63.) Plaintiffs' filings counter each of Defendants' threshold arguments (*see, e.g.*, Pls.' Mot. at 22–23, 32), and insist that there are "numerous independent grounds" for concluding that the Lesson Plan is unlawful (*id*. at 39 (asserting that the Lesson Plan contradicts the INA, was revised in an arbitrary and capricious manner, was not amended through notice-and-comment rulemaking, and/or violates the Due Process Clause)). Plaintiffs also maintain that the INA does not curtail this Court's authority to issue any appropriate equitable remedy. (*See id.* at 63.)

For the reasons explained fully below, the Court concludes that there is no threshold impediment to its reaching the merits of Plaintiffs' legal claims, and that certain provisions of the Lesson Plan are manifestly inconsistent with the INA and its implementing regulations as a matter of law. Moreover, because the unlawful provisions of the Lesson Plan cannot be severed from the remainder of the document, this Court finds that the entire document must be vacated, which is a remedy that the Court retains full equitable power to order under the circumstances presented in this case. In addition, to remedy the application of unlawful standards in the context of the screening processes that USCIS undertook to evaluate Plaintiffs' asylum eligibility, the

Court will require USCIS to provide new credible fear determinations for each Plaintiff.

Thus, Plaintiffs' motion for summary judgment will be **GRANTED** with respect to their first claim for relief, and Defendant's cross-motion for summary judgment will be **DENIED**.  Furthermore, the Lesson Plan will be **VACATED** in its entirety, and Defendants will be **ENJOINED** to void each Plaintiff's existing credible fear determination and provide Plaintiffs with new credible fear interviews, as necessary for Defendants to make a lawful determination regarding whether each Plaintiff has a credible fear of persecution that entitles her to a full removal hearing.  A separate Order consistent with this Memorandum Opinion will follow.

## II.    BACKGROUND

### A.    Credible Fear Screenings And The U.S. Asylum Process

For almost a century, Congress has recognized that citizens of foreign states are sometimes forced to flee from persecution in their home countries, and it has been the policy of the United States government that this country ought to serve as a place of refuge for persons who are in such distress.  "[T]he language through which Congress has implemented this policy since 1947 has changed slightly from time to time[,]" but "the basic policy has remained constant—to provide a haven for homeless refugees and to fulfill American responsibilities in connection with the International Refugee Organization of the United Nations." *Rosenberg v. Yee Chien Woo*, 402 U.S. 49, 52 (1971).  The Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (codified at 8 U.S.C. §§ 1157–1159), specifically embraces the United States' commitment to providing safe harbor for refugees insofar as it acknowledges "the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their

homelands," and "encourage[s] all nations to provide assistance and resettlement opportunities to refugees to the fullest extent possible[,]" 8 U.S.C. § 1521 note; *see also I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 436–37 (1987).

In keeping with this well-settled policy, over the course of the last four decades, Congress has codified various procedures that govern *how* the United States will evaluate and process the admission requests of refugees.  Federal law provides that "any person who is outside any country of such person's nationality" and who is "unable or unwilling to return to . . . that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion" qualifies as a "refugee[.]"  8 U.S.C. § 1101(a)(42)(A). Statutes authorize the Attorney General to grant "asylum" to any refugee, *id.* § 1158(b)(1)(A), and further mandate that even when a noncitizen is subject to a rapid expulsion process known as "expedited removal" (because they fit within an established category of persons who can be summarily removed without full hearings or other process), such noncitizen can only be so removed if she does *not* have "an intention to apply for asylum under [8 U.S.C. § 1158] or a fear of persecution."  *Id*. § 1225(b)(1)(A)(i).[3]

---

[3] Expedited removal is a statutorily authorized process that permits the government to reject the entry into the United States of certain categories of noncitizens "without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i).  By statute, the Attorney General has "sole and unreviewable discretion" to "designate[]" for expedited removal "any or all" noncitizens who are deemed inadmissible (as defined by sections 1182(a)(6)(C) and (a)(7) of the INA) and who have "not affirmatively shown" that they have "been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility[.]"  *Id*. § 1225(b)(1)(A)(iii)(I)–(II).  The Attorney General has conferred this designation authority to DHS, *see Inspection and Expedited Removal of Aliens,* 62 Fed. Reg. 10,312, 10,355 (Mar. 6, 1997); 6 U.S.C. § 557 (2003), which, until recently, opted to designate for expedited removal only those inadmissible noncitizens who were encountered near the border and had been in the country for no longer than 14 days, *see Designating*

Significantly for present purposes, federal immigration law plainly establishes that, for those noncitizens who are designated for expedited removal—such as the five individual plaintiffs in this case—applying for asylum is a two-stage process.  To start, if a noncitizen encounters a CPB agent or other immigration officer and "indicates either an intention to apply for asylum . . . or a fear of persecution" in their home country, the immigration officer is required to "refer the alien for an interview by a[] [USCIS] asylum officer," who has the responsibility of determining whether or not the individual has a credible "fear of persecution."  8 U.S.C. § 1225(b)(1)(A)(ii).  This initial evaluation is a "screening interview[,]" *Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1965 (2020), and it poses a "low bar" for asylum applicants, *id.* at 1967; *see also Regulations Concerning the Convention Against Torture*, 64 Fed. Reg. 8,478, 8,479 (Feb. 19, 1999) (noting that the credible fear determination merely permits a screening officer to "quickly identify potentially meritorious claims to protection and to resolve frivolous ones with dispatch").  Thus, for the purpose of an asylum officer's credible fear assessment, the noncitizen need not demonstrate "that he or she *is in fact eligible* for asylum[.]"  *Thuraissigiam*, 140 S. Ct. at 1965 (emphasis in original).  Rather, according to the statute, "the term 'credible fear of persecution' means that there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such

_____

*Aliens for Expedited Removal*, 69 Fed. Reg. 48,877, 48,880 (Aug. 11, 2004).  In July of 2019, DHS issued a notice that expands the categories of individuals who are subject to expedited removal, to include all inadmissible noncitizens located "anywhere in the United States" who have "not been physically present in the United States continuously for the [preceding] two-year period[.]" *Designating Aliens for Expedited Removal*, 84 Fed. Reg. 35,409, 35,414 (July 23, 2019).

other facts as are known to the officer, that the alien could establish eligibility for asylum[.]"  8 U.S.C. § 1225(b)(1)(B)(v).

The applicable statute, *i.e.*, section 1225(b) of Title 8 of the United States Code, also plainly addresses the consequences of a positive or adverse credible fear finding during this initial screening process.  If the asylum officer determines that the noncitizen has a credible fear of persecution, the individual "shall be detained for further consideration of the application for asylum," 8 U.S.C. § 1225(b)(1)(B)(ii), and, thus, shall proceed to the full proceeding stage of the asylum application process, *see* 8 C.F.R. § 208.30(f) ("If an alien . . . is found to have a credible fear of persecution or torture, the asylum officer will . . . issue a Form I-862, Notice to Appear, for full consideration of the asylum and withholding of removal claim in proceedings" under section 1229a of Title 8 of the United States Code).  By contrast, if the asylum officer determines that the noncitizen does *not* have a credible fear of persecution, "the officer shall order the alien removed from the United States without further hearing or review." 8 U.S.C. § 1225(b)(1)(B)(iii)(I).  At that point, the noncitizen can ask an immigration judge to review the negative credible fear determination, *see id.* §§ 1225(b)(1)(B)(iii) (I)–(III), and if such a review is requested, the immigration judge reviews the matter *de novo*, based on the "record of the [asylum officer's] negative credible fear determination," 8 C.F.R. § 1208.30(g)(2)(ii), supplemented with any additional "oral or written statement" that the immigration judge decides, in her sole discretion, to receive into evidence, *id.* § 1003.42(c).  The immigration judge must also give the noncitizen the opportunity to be heard and questioned, either in person or via remote connection. *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(III).  However, with or without additional evidence,

the immigration judge's review is a "highly expedited" affair that "is meant to conclude within 24 hours." *Make the Rd. New York v. Wolf* ("*MTRNY II*"), 962 F.3d 612, 619 (D.C. Cir. 2020).

Ultimately, if the immigration judge concludes that the noncitizen has a credible fear of persecution, the asylum officer's negative credible fear determination will be vacated, and the agency will place the individual into full removal proceedings, *see* 8 C.F.R. §§ 208.30(e)(5), 1003.42(f), 1208.30(g)(2)(iv)(B); *see also* 8 U.S.C. § 1225(b)(1)(B)(ii), by serving on the noncitizen and filing with the immigration court a Notice to Appear, *see* 8 C.F.R. § 235.6(a)(1)(iii); *id*. § 1239.1(a).[4]  But if the immigration judge concurs with the asylum officer's decision that the noncitizen does not have a credible fear of persecution, then the individual will be "removed from the United States without further hearing or review." 8 U.S.C. § 1225(b)(1)(B)(iii)(I); *see also* 8 C.F.R. § 1208.30(g)(2)(iv)(A).  Moreover, and importantly, the noncitizen's bid for asylum ends there, because the INA expressly prohibits further review of the negative credible fear determination, whether by the Board of Immigration Appeals ("BIA") or in federal court.  *See* 8 U.S.C. §§ 1225(b)(1)(C), 1252(a)(2)(A)(iii), (e)(2); *see also* 8 C.F.R. § 1003.42(f).

---

[4] This Court takes judicial notice of the fact that, at the time that Plaintiffs were evaluated for credible fear, 47% of those who received a negative credible fear determination sought review by an immigration judge, and only 20% of those were overturned upon review.  *See* Executive Office for Immigration Review, Adjudication Statistics, *Credible Fear and Asylum Process: Fiscal Year (FY) 2019 Quarter 2* (June 21, 2019), http://perma.cc/9DSX-LDUE.  *Cf. Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013) (taking judicial notice of the contents of a document posted on a government website).

B.     USCIS's "Lesson Plan On Credible Fear Of Persecution And Torture Determinations"

Given the significance of the credible fear determination with respect to the asylum process, it is not surprising that Congress has authorized the agency that is responsible for executing immigration policy (that is, DHS) to "establish such regulations" as it deems "necessary for carrying out" the asylum-screening process described above, *see* 8 U.S.C. § 1103(a)(3), and also to "issue such instructions" as are necessary to "control, direct[], and supervis[e] . . . all employees" of DHS, so as to ensure that the complex statutory immigration system is being administered properly, *id.* § 1103(a)(1)–(3).  The importance of proper training for agency officials is expressly acknowledged by statute: the INA specifically states that training must be provided for all "officers adjudicating asylum cases under section 1158[,]" *id.* § 1157(f), and with respect to the "asylum officer[s]" who conduct credible fear interviews in particular, the INA requires such officers to receive "professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of [asylum] applications[,]" *id.* § 1225(b)(1)(E)(i). DHS has also promulgated regulations that require asylum officers to receive "special training in international human rights law, nonadversarial interview techniques, and other relevant national and international refugee laws and principles."  8 C.F.R. § 208.1(b).  Indeed, "[a]s of February 2020, training for [USCIS] asylum officers consisted of at least 9 weeks of formal training and 3 to 4 weeks of additional credible fear training for asylum officers in offices with heavy credible fear caseloads[,]" as well as "4 hours per week of ongoing training."  *A.B.-B. v. Morgan*, No. 20-cv-846, 2020 WL 5107548, at *7 (D.D.C. Aug. 31, 2020).

In accordance with its statutory and regulatory obligation to train its asylum officers, USCIS publishes a guidance document that it calls the "Lesson Plan on Credible Fear of Persecution and Torture Determinations." (*See* Lesson Plan at 2–38.) To this Court's knowledge, there have been at least six versions of this particular Lesson Plan, dated April 14, 2006 (*see* ECF No. 61-3, at 2), March 7, 2013 (*see* ECF No. 61-5, at 2–40), February 28, 2014 (*see* ECF No. 61-4, at 2–48), February 13, 2017 (ECF No. 61-2, at 2–48), April 30, 2019 (*see* ECF No. 61-1, at 2–38), and September 30, 2019 (*see* ECF No. 58-1, at 2–39).  The April 2019 version of the Lesson Plan was in effect when asylum officers made the adverse credible fear determinations in Plaintiffs' cases. (*See* Am. Compl. ¶ 8.)[5]

The April 2019 Lesson Plan is 37 pages long, and is divided into eleven sections. At the outset, the document purports "to explain how to determine whether an alien subject to expedited removal or an arriving stowaway has a credible fear of persecution or torture[,]" so that asylum officers "will be able to correctly make a credible fear determination consistent with the statutory provisions, regulations, policies, and procedures that govern whether the applicant has established a credible fear of persecution or a credible fear of torture." (Lesson Plan at 2.)  The Lesson Plan then proceeds to instruct asylum officers how to "[i]dentify which persons are subject to expedited removal" (*id.*; *see id.* at 7–10), and then discusses the function of the credible

---

[5] Plaintiffs have requested that their claims with respect to the allegedly unlawful aspects of the April 2019 Lesson Plan be applied to the now-effective September 2019 version of the Lesson Plan as well, given that the document did not change in any relevant respect when the September 2019 version issued. (*See* Pls.' Mot. for Leave to File Suppl. Pleading, ECF No. 62.)  The Court granted Plaintiffs' request on October 31, 2020 (*see* Minute Order of Oct. 31, 2020), and accordingly, throughout this Memorandum Opinion, any references to the "Lesson Plan" should be construed as a reference to both versions of that document (April 2019 and September 2019).

fear screening (*see id.* at 10), followed by a description of the concept of a "credible fear" of persecution or torture that also addresses the standard of proof required to establish a credible fear (*see id.* 10–14).  In this regard, the Lesson Plan specifically instructs that "the credible fear significant possibility standard of proof . . . requires the applicant to identify more than significant evidence that the applicant is a refugee entitled to asylum" (*id.* at 13 (internal quotation marks omitted)), and that, "even where the officer might otherwise find the testimony credible[,]" an asylum officer can require the credible fear interviewee to "provide evidence that corroborates the applicant's testimony" (*id.* at 12).  The Lesson Plan focuses next on the procedures for making a credible fear determination: it directs asylum officers how to evaluate credibility in a credible fear interview (*see id.* at 14–18), and identifies the "elements" that are necessary for establishing a credible fear of persecution (*see id.* at 19–26) or a credible fear of torture (*see id.* at 26–32).  The document also states that, "[i]n order to establish a credible fear of persecution, the applicant must establish each one of the elements" of her asylum claim.  (*Id.* at 20.)  It then moves on to addressing auxiliary matters such as the applicability of bars to asylum (*see id.* at 32–33), and the treatment of dependents (*see id.* at 33–34), before closing with a summary overview (*see id.* at 35–38).

C.    **Plaintiffs' Asylum-Related Experiences**

Beginning in the spring of 2019, at around the same time as the USCIS issued the April 2019 version of the Lesson Plan, the five individual plaintiffs in this case were deemed subject to expedited removal, after which they expressed an intention to apply for asylum.  Each Plaintiff then proceeded to have a credible fear screening interview with a USCIS asylum officer, and each was found not to have a credible fear of

persecution, notwithstanding the alleged circumstances under which she had left her home country and arrived in the United States.   What follows is a brief recounting of the complaint's allegations concerning each Plaintiff's asylum-related experiences, as well as her efforts to challenge the adverse credible fear determination that prevented her from proceeding to the full asylum application review process.

       1.   <u>Maria Kiakombua</u>

Plaintiff Maria Kiakombua allegedly "fled her home in Angola to escape her boyfriend, a member of the country's military, who beat her—sometimes with a machete—and threatened to kill her if she left him" (Compl., ECF No. 1, ¶ 8), and to find refuge from "repeated attacks . . . at the hands of government officials" (*id.*), who were "associated with Ms. Kiakombua's boyfriend [and] came to her home and raped her in the presence of her children, due in part to her failure to abide by societal norms regarding the proper role and behavior of women" (*id.* ¶ 12).   According to the complaint, Kiakombua "reached the U.S. border and sought asylum" in April of 2019, "but an asylum officer found that she lacked a credible fear under the Lesson Plan." (*Id.* ¶¶ 8, 12.)   In May of 2019, "[a]n immigration judge subsequently agreed" with the asylum officer's conclusion (*id.* ¶ 13), and Kiakombua was then "detained in the custody of the Department of Homeland Security" pending removal to Angola (*id.* ¶ 12).   On June 6, 2019, through "the assistance of *pro bono* immigration consultant[,]" Kiakombua sought "reconsideration of the asylum officer's negative credible fear determination" (Am. Compl. ¶ 15), but that request was denied after a follow-up interview (*see id.* ¶ 16).

Kiakombua filed the instant lawsuit on June 25, 2019.  (*See id.* ¶ 17.)  The following day Kiakombua (through counsel) "requested that Defendants voluntarily agree to stay [her] expedited removal, to obviate the need for Ms. Kiakombua to request that relief from the Court" (*id.* ¶ 18), and one day later, on June 27, 2019, USCIS notified Kiakombua that the agency "had *sua sponte* reconsidered its prior denial of her June 6, 2019[,] request for reconsideration, and had found that Ms. Kiakombua has a credible fear" (*id.* ¶ 19).  Kiakombua remains detained in USCIS custody (*see id.* ¶ 13), and has apparently been served with a Notice to Appear for full removal proceedings at a date and time "TBD" (*see* Sealed Ex. D to Defs.' Reply ("Kiakombua NTA"), ECF No. 4, at 2).

On June 28, 2019, Kiakombua's counsel filed an amended complaint that names four additional plaintiffs, each of whom is proceeding under a pseudonym.  (*See* Am. Compl. ¶¶ 20, 22, 24, 26.)[6]

### 2.    "Sofia" and "Julia"

Sofia is a Cuban "medical doctor" who is married to a U.S. lawful permanent resident.  (*Id.* ¶ 24.)  Sofia allegedly "opposes Cuba's ruling party, [and] has made her views known through her political positions and refusal to acquiesce in demands of government officials."  (*Id.*)  According to the amended complaint, the Cuban government "has accused [Sofia] of being anti-revolutionary and subjected her to

---

[6] These four plaintiffs filed a motion to proceed pseudonymously on June 28, 2019.  (*See* Pls.' Mot. for Leave to Proceed Under Pseudonyms, ECF No. 7.)  The Court granted this motion, and determined that, "[w]hen weighed against the minimal interest in disclosure of the identities of the Pseudonymous Plaintiffs, the Pseudonymous Plaintiffs' significant interest in maintaining anonymity at this early stage in the litigation is more than sufficient to overcome any general presumption in favor of open proceedings."  (*See* Order, ECF No. 12, at 9.)

surveillance, threats, and detention[,]" and "[t]he fear and stress Sofia experienced as a result of the Cuban government's actions led her to miscarry a pregnancy and ultimately to decide to flee to the United States immediately, rather than risk waiting in Cuba until her husband's petition [on her behalf] was processed." (*Id.*) Sofia came to the United States in April of 2019, seeking asylum, but an "asylum officer determined—pursuant to a credible fear process governed by the unlawful standards and procedures contained in the Lesson Plan, and after an interview that lasted under ninety minutes, including interpretation—that Sofia lacked a credible fear of persecution or torture." (*Id.* ¶ 25.) "An immigration judge subsequently agreed" and Sofia's request for reconsideration was denied (*id.*); thus, Sofia "was deported to Cuba, where she has been questioned by the authorities about why she fled[,]" and where she "lives in constant fear of further governmental threats and harassment" (*id.*).

According to the amended complaint, Julia has also been deported back to her home country (El Salvador) after a negative credible fear determination in May of 2019 that was subsequently affirmed by an immigration judge. (*See id.* ¶ 27.) Julia allegedly "fled El Salvador after witnessing the murder of a neighbor committed by gang members" and after receiving multiple death threats from that gang "if she reported their crime to the police." (*Id.* ¶ 26.) The amended complaint alleges that Julia came to the United States seeking protection in April of 2019, but an asylum officer determined that she "lacked a credible fear of persecution or torture" under the newly revised Lesson Plan. (*Id.* ¶¶ 26–27.)

15

3.     "Ana" and "Emma"

Ana was allegedly "forced to flee El Salvador after receiving death threats from gang members who targeted her husband, [who is] a landowner, and his family." (*Id.* ¶ 20.) According to the amended complaint, "[i]n addition to sending death threats to [Ana], the gang members threatened several other family members and shot her husband and her nine-year-old granddaughter, although both survived." (*Id.*) The local "police were of little assistance" and, therefore, in May of 2019, Ana sought refuge in the United States. (*Id.*) After "an asylum officer determined[,]" allegedly pursuant to the Lesson Plan, "that Ana lacked a credible fear of persecution or torture[,]" and "[a]n immigration judge subsequently agreed[,]" Ana was detained pending removal. (*Id.* ¶ 21.)

Emma also allegedly "fled El Salvador fearing for her life and came to the United States seeking protection in May [of] 2019." (*Id.* ¶ 22.) According to the amended complaint, Emma was "beaten and sexually abused by her brother[,]" and was also "threatened and emotionally and physically abused by the father of her daughter[,]" but she was unable to report him to the local authorities because of his "close associations with the police." (*Id.*) The amended complaint alleges that, in June of 2019, an asylum officer determined pursuant to the Lesson Plan "that Emma lacked a credible fear of persecution or torture[,]" and Emma has been ordered detained pending "her hearing with an immigration judge, who will review the negative decision issued by the asylum officer." (*Id.* ¶ 23.)

On July 8, 2019, Plaintiffs Ana and Emma filed an emergency motion for an administrative stay of their impending removals (*see* Pls.' Mot. for Admin. Stay of

16

Removal, ECF No. 13, at 1), which this Court granted—over Defendants' objection on

jurisdictional grounds (*see* Defs.' Opp'n to Pls.' Mot. for Admin. Stay of Removal, ECF

No. 16)—"pending resolution of th[e] Court's determination of whether it has

jurisdiction to enter a stay of removal in this case" (Order, ECF No. 18, at 2 (citing

Order Granting Temporary Stay of Removal, *Grace v. Whitaker*, No. 18-cv-1853, ECF

No. 21)).  The next day, on July 9, 2019, an immigration judge purportedly determined

that Emma's negative credible fear determination should be vacated (*see* Ex. A to

Defs.' Mot. ("*In the Matter of Emma*"), ECF No. 31-3, at 2), and it appears that around

that same time Ana's negative credible fear determination was reversed by the agency

*sua sponte*.  Shortly thereafter, Notices to Appear for full removal proceedings at a date

and time "TBD" were issued to both Ana and Emma.  (*See* Sealed Ex. A to Defs.'

Notice of Sealed Filing ("Ana's NTA"), ECF No. 81-1, at 2; Ex. B to Defs.' Notice of

Sealed Filing ("Emma's NTA"), ECF No. 81-2, at 2.)

### D.    Procedural History

As mentioned above, Kiakombua filed her original complaint on June 25, 2019

(*see* Compl., ECF No. 1), and Ana, Emma, Sofia, and Julia joined with Kiakombua to

file an amended complaint three days later (*see* First Am. Compl., ECF No. 6), which

was subsequently supplemented and superseded (*see* Suppl. First Am. Compl. ("Am.

Compl."), ECF No. 62-2).[7]  Their pleading alleges that the asylum officers who

---

[7] There are no material differences between the first amended complaint and the supplemented first amended complaint.  (*See* Ex. 2 to Pls.' Mot. for Leave to File Suppl. Pleading, ECF No. 62-3 (including a redline comparing the first amended complaint to the supplemented first amended complaint).)  Accordingly, and consistent with this Court's Minute Order of October 31, 2020, any reference and citation throughout this Memorandum Opinion to the "Amended Complaint" should be construed as referring to the "Supplemented First Amended Complaint."

undertook to make their credible fear determinations relied on the April 2019 Lesson Plan (*see id*. ¶¶ 14, 21, 23, 25, 27), and that the Lesson Plan's credible fear guidance is unlawful for three "independent" reasons (Pls.' Mot. at 39).

> 1.   Plaintiffs' Legal Claims

Plaintiffs' "First Claim for Relief" (*see* Am. Compl. ¶¶ 89–98) is brought under section 1252(e)(3) of the INA: Plaintiffs allege that the Lesson Plan is one of the agency's written policies that is made reviewable pursuant to section 1252(e)(3) of the INA, and that it must be "vacated" upon review (*id.* ¶ 98), because it is both not "consistent with applicable provisions of [Subchapter II of the INA]" (*id.* ¶ 90 (quoting 8 U.S.C. § 1252(e)(3)(A)(ii)) (alteration in original)), as amended by the Refugee Act (*see id.* ¶ 92), and "otherwise in violation of law" (*id.* ¶ 90 (quoting 8 U.S.C. § 1252(e)(3)(A)(ii)), insofar as it violates the arbitrary-and-capricious prohibition of the APA (*see id.* ¶¶ 91, 96), the Convention Against Torture and its implementing regulations (*see id.* ¶ 93), and "customary international law" (*id.* ¶¶ 94–95).

Plaintiffs' "Second Claim for Relief" (*id.* ¶¶ 99–103) invokes section 706(2)(D) of the APA, which authorizes courts to hold "unlawful and set aside" agency actions that fail "to observe the procedure required by the APA" (*id.* ¶ 103 (citing 5 U.S.C. § 706(2)(D)).  In this regard, the amended complaint alleges that the APA "requires agency action that is substantive (or 'legislative') in nature to follow notice-and-comment procedures" (*id.* ¶ 100), and that, even though the Lesson Plan "reflects one or more substantive rules" (*id.* ¶ 101), "Defendants did not follow notice-and-comment rulemaking procedures" (*id.* ¶ 102).

Plaintiffs' "Third Claim for Relief" invokes the Due Process Clause of the Fifth Amendment to the U.S. Constitution.  (*Id*. ¶¶ 104–108.)  Plaintiffs allege that they have a constitutionally "protected interest . . . in not being removed to countries where they face serious danger, persecution, and potential loss of life" (*id.* ¶ 105), and that, although the Due Process Clause entitles them to a "fair hearing of their claims, and a meaningful opportunity to establish their potential eligibility for asylum and other forms of relief from removal" (*id.* ¶ 106), the Lesson Plan violates those rights by "subjecting [Plaintiffs'] claims to unlawful, more burdensome legal standards" (*id.* ¶ 107), and therefore should "be enjoined" (*id.* ¶ 108).

Based on these alternative grounds for relief, Plaintiffs seek various remedies (*see* Am. Compl. at 26–27 ("Prayer for Relief")), including: (1) a declaration that the Lesson Plan, all related guidance documents, and all credible fear proceedings undertaken pursuant to the Lesson Plan are not consistent with the INA (*see id.* ¶ 4); (2) an order vacating the entire Lesson Plan and prospectively enjoining its use (*see id.* ¶¶ 5–6); (3) vacatur of any negative credible fear determinations and removal orders issued to Plaintiffs, and injunctive relief to provide them with new credible fear screenings or, in the alternative, to place them in full removal proceedings (*see id.* ¶¶ 3, 7); and (4) as to Plaintiffs Sofia and Julia, who were deported, injunctive relief to either parole them into the United States and provide them new credible fear interviews under the correct legal standards (*see id.* ¶ 7), or, alternatively, place them in full removal proceedings (*see id.*).

2.      The Parties' Cross-Motions For Summary Judgment

Following this Court's administrative stay of Plaintiffs Ana's and Emma's

removals (*see* Order, ECF No. 18), the parties agreed to file cross-motions for summary

judgment in lieu of separately briefing various jurisdictional issues that Defendants

intended to raise concerning these Plaintiffs' request for a stay of removal (*see* Defs.'

Mot., ECF No. 31-1; Pls.' Mot., ECF No. 36-1).  The parties' cross-motions ripened on

October 10, 2019.  (*See* Defs.' Reply, ECF No. 49; Pls.' Reply, ECF No. 60.)[8]

In their motion for summary judgment, which takes a kitchen-sink approach,

Defendants first raise a number of threshold arguments concerning Plaintiffs' lack of

Article III standing and the Court's lack of subject-matter jurisdiction over Plaintiffs'

claims.  They argue, for example, that this Court "should dismiss the Amended

Complaint because no Plaintiff has standing to challenge the Lesson Plan."  (Defs.'

Mot. at 24.)  They also maintain that "the INA precludes the Court from exercising

jurisdiction over this case[,]" because (1) "the Lesson Plan does not 'implement' the

expedited removal statute" for the purpose of section 1252(e)(3)(A)(ii) (*id.* at 30), or

(2) "the Lesson Plan is not a statute, regulation, policy directive, policy guideline, or

procedure" within the meaning of section 1252(e)(3)(A)(ii) (*id.* at 30–31), or (3) the

Lesson Plan does not meet the "jurisdictional requirement that these challenges be filed

'no later than 60 days after the date the challenged [action] . . . is *first* implemented'"

(Defs.' Reply at 17 (quoting 8 U.S.C. § 1252(e)(3)(B))).  Over the course of multiple

---

[8] In addition, on September 20 and 27, 2020, three organizations filed amicus briefs in support of Plaintiffs' position: the Advocates for Human Rights (*see* ECF No. 46); the National Citizenship and Immigration Services Council 119 (*see* ECF No. 47); and the Tahirih Justice Center (*see* ECF No. 55). The Immigration Reform Law Institute filed an amicus brief in support of Defendants on August 30, 2019.  (*See* ECF No. 35.)

filings submitted over many months, Defendants have also pressed another independent ground for dismissal: that the entire dispute is moot, because "Defendants have placed [Kiakombua, Ana, and Emma] into full § 1229a removal proceedings by filing a 'Notice to Appear'" (Defs.' Reply at 13; *see also* Defs.' Status Update on Mootness ("Defs.' Mootness Notice"), ECF No. 80, at 1–2), and because Sofia and Julia "have been removed" (Defs.' Mootness Notice at 4).

With respect to the merits of Plaintiffs' claims, Defendants generally contend that "the Lesson Plan is not actionable under either the APA or the INA[,]" because it is nothing more than "a training module that agency instructors are supposed to use to train asylum officers to correctly make credible fear determinations consistent with applicable law." (Defs.' Mot. at 37.)  Defendants further argue, more specifically, that the Lesson Plan is not a "'rule' as defined in the APA" (*id.*); does not "impose obligations or confer rights on anybody" (*id.*); has "no legal significance" (*id.*); and is not "final" within the meaning of the APA, and is therefore not subject to APA review (*id.*).  Additionally, Defendants argue that Plaintiffs' INA claim fails because the Lesson Plan does not "misstate the immigration statutes and DHS's own regulations" (*id.* at 48) and, instead, "reasonably portrays asylum and CAT law" (*id.* at 51). Furthermore, according to Defendants, while Plaintiffs' "due process claim also fails on the merits" (*id.* at 60), Plaintiffs have not satisfied the threshold requirement of establishing that "the Lesson Plan falls short of the minimum constitutional procedures [the immigration] statutes purport to provide" (*id.* at 59 (citation omitted)).  Lastly, Defendants maintain that, even if the Court agrees with Plaintiffs on the merits, the Court "may only determine the Lesson Plan's lawfulness, and lacks statutory authority

to enjoin or vacate the Lesson Plan or stay removals." (*Id.* at 63; *see also id.* at 67 (arguing that, accordingly, "the Court should dissolve its earlier stay [of removal] order").)

Plaintiffs' cross-motion for summary judgment argues that each Plaintiff has "the personal stake necessary to establish standing" under Article III, because each has received a negative credible fear determination, and because "all five had their protection claims evaluated under the Lesson Plan" that is being challenged in this action. (Pls.' Mot. at 32.) Thus, Plaintiffs say that their injuries are "traceable" to the Lesson Plan and can be remedied by the Court. (*Id.*) Plaintiffs also argue that this Court has jurisdiction over their claims, either pursuant to the express terms of section 1252(e)(3) of the INA, or pursuant to section 1331 of Title 28, given that section 1252 "as a whole" does not strip the Court's section 1331 jurisdiction in this context. (*Id.* at 30 (internal quotation marks and citation omitted).) Plaintiffs further reject Defendants' contention that their claims have become moot as "utterly meritless[.]" (Pls.' Resp. to Defs.' Mootness Notice, ECF No. 82, at 1.) And as to the merits of their claims, Plaintiffs contend that Defendants' arguments for why "the Lesson Plan is unreviewable" under the APA are all "red herrings" (Pls.' Mot. at 36) and, in any event, that the Court can set aside the Lesson Plan "on numerous independent grounds," including that: (1) "it is not consistent with the governing [immigration] statutes and regulations" (*id.* at 39); (2) "it was revised in an arbitrary and capricious manner" and (3) "it was required to, but did not, go through notice and comment rulemaking" (*id.*); and (4) "it is not consistent with due process" (*id.*). Finally, in closing, Plaintiffs argue

that section 1252 "does not curtail this Court's [traditional] authority to issue a [full] remedy" in this case.  (*Id.* at 63.)

The Court held a motions hearing on October 22, 2019 (*see* Minute Entry of Oct. 22, 2019), after which it ordered the parties to file supplemental briefs on the issue of remedies, with a particular focus on whether the *entire* Lesson Plan had to be vacated if Plaintiffs were successful or whether the allegedly unlawful provisions of the Lesson Plan were severable from the remainder of the document.  (*See* Pls.' Suppl. Br. on Severability, ECF No. 68; Defs.' Suppl. Br. on Severability, ECF No. 69.)  The Court subsequently administratively stayed its consideration of the parties' cross-motions and supplemental briefs, pending the D.C. Circuit's decision in *Grace v. Barr ("Grace II")*, 965 F.3d 883 (D.C. Cir. 2020).  (*See* Minute Order of Mar. 5, 2020 (noting that *Grace II* "present[ed] threshold issues concerning the meaning of various statutory terms" under the INA, and "substantially similar questions of law arise in the context of the present dispute").)  The D.C. Circuit released its opinion in *Grace II* on July 17, 2020, after which this Court lifted its stay and ordered supplemental briefs on the impact of *Grace II* with respect to the instant dispute.  (*See* Minute Order of July 22, 2020; *see also* Defs.' Suppl. Brief Regarding Grace v. Barr ("Defs.' Grace Brief"), ECF No. 72; Pls.' Suppl. Brief Regarding Grace ("Pls.' Grace Brief"), ECF No. 76; Pls.' Suppl. Responsive Brief Regarding Grace ("Pls.' Grace Reply"), ECF No. 77; Defs.' Reply Suppl. Brief Regarding Grace v. Barr ("Defs.' Grace Reply"), ECF No. 78.)  The parties' cross-motions for summary judgment are now ripe for decision.

## III.   LEGAL STANDARDS

Although Defendants' motion is formally styled as a motion for summary judgment (*see* Defs.' Mot. at 1), Defendants vigorously contend, as threshold matter, that "the Court lacks jurisdiction over this case and should dismiss it" (*id.* at 36). Consequently, Defendants' cross-motion is best construed as a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) or, *in the alternative*, a motion for summary judgment under Rule 56(a).  *See, e.g.*, *Kirkham v. Société Air France*, 429 F.3d 288, 291 (D.C. Cir. 2005); *see also* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2713 (4th ed. 2020) ("[T]he label attached to the motion should not prevent the court from deciding a summary-judgment motion challenging the court's subject-matter jurisdiction as a suggestion that the court dismiss the action on that ground.").  Thus, the legal standards for both Rule 12(b)(1) motions to dismiss and Rule 56 motions for summary judgment apply in the instant circumstances.

### A.   Motions To Dismiss Under Federal Rule Of Civil Procedure 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1)—which authorizes a party to challenge by motion the "lack of subject-matter jurisdiction[,]" Fed. R. Civ. P. 12(b)(1)— "imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority[,]" *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  "The requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998) (internal quotation marks and

alterations omitted); *see also Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (explaining that "[f]ederal courts are courts of limited jurisdiction" and, thus, "possess only that power authorized by Constitution and statute").

The doctrines of standing, mootness, and ripeness are "[t]hree inter-related" doctrines that determine the "constitutional boundaries" of a court's jurisdiction. *Worth v. Jackson*, 451 F.3d 854, 855, 857 (D.C. Cir. 2006). Indeed, "the defect of standing is a defect in subject matter jurisdiction[,]" *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987), and so, too, is a motion to dismiss for mootness "properly brought under Federal Rule of Civil Procedure 12(b)(1)[,]" *Friends of Animals v. Salazar*, 670 F. Supp. 2d 7, 11 (D.D.C. 2009). Likewise, because a court's subject-matter jurisdiction is "a statutory requirement[,]" *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003) (internal quotation marks and citation omitted), "congressional preclusion of judicial review is in effect jurisdictional" as well, *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 353 n.4 (1984).

When ruling on a Rule 12(b)(1) motion, a court must "treat the complaint's factual allegations as true" and afford the plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Delta Air Lines, Inc. v. Exp.-Imp. Bank of U.S.*, 85 F. Supp. 3d 250, 259 (D.D.C. 2015) (internal quotation marks and citation omitted). However, those factual allegations receive "closer scrutiny" than they would in the Rule 12(b)(6) context. *Id.* (internal quotation marks and citation omitted). Moreover, unlike a Rule 12(b)(6) motion, the court may look to documents outside of the complaint in order to evaluate whether or not it has jurisdiction to entertain a claim. *See Jerome Stevens Pharms., Inc. v. F.D.A.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005). If the court

25

determines that the plaintiff lacks standing, or a claim is moot because it no longer presents a live controversy, or the court has no statutory jurisdiction, then the court lacks subject-matter jurisdiction to entertain the claim and must dismiss it.  *See* Fed. R. Civ. P. 12(b)(1), (h)(3).

   **B.     Rule 56 Motions For Summary Judgment With Respect To Legal Claims That Assail Agency Action Under The APA And Otherwise**

   Pursuant to Federal Rule of Civil Procedure 56, if a case raises "no genuine dispute as to any material fact[,]" courts will ordinarily enter summary judgment in favor of the party that "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  And if both parties file cross-motions for summary judgment concerning issues that "are purely legal in nature[,]" then "the entry of summary judgment for the party entitled to prevail as a matter of law is appropriate."  *Teva Pharms., Indus., Ltd. v. F.D.A.*, 355 F. Supp. 2d 111, 116 (D.D.C. 2004), *aff'd*, 410 F.3d 51 (D.C. Cir. 2005). *But see Barr Labs., Inc. v. Thompson*, 238 F. Supp. 2d 236, 244 (D.D.C. 2002) (explaining, with respect to cross-motions for summary judgment, that "the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed").

   Notably, with respect to cross-motions for summary judgment concerning legal claims that challenge agency action under the APA, the respective duties of the agency and the court are well established: "it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Catholic Health Initiatives v. Sebelius*, 658 F. Supp. 2d 113, 117 (D.D.C. 2009)

(internal quotation marks and citations omitted).  However, if a plaintiff alleges that an agency has engaged in conduct that directly contravenes a substantive statute that has a cause of action for that violation—such as claims brought under section 1252(e)(3) of the INA for agency conduct that is "not consistent with applicable provisions of this subchapter [of the INA] or is otherwise in violation of law," 8 U.S.C. § 1252(e)(3)(A)(ii)—"the Court is not limited to the administrative record in conducting its legal analysis[,]" and "must take into account relevant legal authority, including statutes, regulations, and agency authority[,]" *Nio v. Dep't of Homeland Sec.*, 385 F. Supp. 3d 44, 59 (D.D.C. 2019).  Those legal authorities are binding on both the court and the agency, and the court will analyze them to determine which party, if any, is entitled to judgment as a matter of law with respect to the plaintiff's challenge to the agency's administrative action.

## IV.   ANALYSIS

The central question at issue in the instant case is whether the Lesson Plan's various pronouncements concerning the manner in which USCIS asylum officers are to make credible fear determinations are irreconcilable with the statutory and regulatory provisions that govern those screenings (*see* Am. Compl. ¶¶ 89–98) or, alternatively, whether USCIS has violated other procedural or constitutional requirements (*see id.* ¶¶ 99–108) with respect to the Lesson Plan's promulgation or its contents.  As now happens with fair frequency, Defendants have presented a slew of arguments concerning various potential threshold impediments to the Court's consideration of the merits of Plaintiffs' legal claims (*see generally* Defs.' Mot. at 24–36)—sometimes all within a

27

single paragraph.[9]  The Court's evaluation of these sometimes conflated contentions has required a methodical analysis of myriad legal issues, some of which the D.C. Circuit has recently considered as well.

Ultimately, as explained below, the Court has determined that each of Defendants' threshold arguments fails, and that several provisions of the Lesson Plan are patently at odds with the credible fear screening scheme that Congress has crafted. Notably this fundamental flaw in the agency's training materials manifests itself in various ways—*e.g.*, at times, USCIS has imported the standards and burdens that apply only during full removal proceedings into the expedited removal screening process; at other times, the agency makes pronouncements about the law that clash with the applicable provisions of the INA itself.  And because the unlawful provisions of the Lesson Plan cannot be effectively severed from the remainder of the document, the Court will exercise its standard equitable authority to vacate the entire Lesson Plan and require USCIS to make new credible fear determinations with respect to each Plaintiff.

---

[9] Defendants' "Status Update on Mootness" (ECF No. 80) provides but one example of this muddled approach.  In a document that purports to address the mootness of Plaintiffs' claims, Defendants write:

> The claims of the remaining two Plaintiffs, Sofia and Julia, are also moot because they have been removed, as Defendants have already explained.  Additionally, Sofia and Julia no longer have standing separately for each claim she seeks to press and for form of relief sought.  Sofia and Julia still need to have a live controversy as to them—i.e., that their alleged injuries would be cured by the Court vacating their credible fear determinations and ordering a new credible fear determination, based on one or more out of the nine challenged provisions being unlawful as applied to them.  As previously explained, Sofia and Julia cannot identify what parts of the operative Lesson Plan will be applied to them, nor can they establish that they have a likelihood of receiving a negative credible fear determination from USCIS or from an immigration judge not following the Lesson Plan.  Their claims are moot, and to the extent they are not, relief must be limited to the injuries *Sofia* and *Julia* can show (e.g., which of the nine challenged Lesson Plan provisions are injuring them).

(Defs.' Mootness Notice at 4–5 (internal quotation marks, citations, and alterations omitted).)  Each of these myriad assertions must be untangled from the others before it can be properly analyzed.

**A.**     **Plaintiffs Have Article III Standing To Challenge The Lesson Plan, And Defendants Have Not Established That Plaintiffs' Claims Are Moot**

1.     Plaintiffs Suffered An Injury In Fact, Which Is Fairly Traceable To The Lesson Plan, And May Be Redressed By An Order Vacating The Lesson Plan And Requiring New Credible Fear Determinations

Defendants' opening salvo is the contention that "no Plaintiff has standing to challenge the Lesson Plan."  (Defs.' Mot. at 24.)  Thus, the Court begins by assessing whether any Plaintiff has, in fact, demonstrated the "irreducible constitutional minimum" circumstances necessary to invoke a federal court's subject-matter jurisdiction over a lawsuit, *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (internal quotation marks and citation omitted), which consist of three elements: injury in fact, causation, and redressability, *see Dominguez v. UAL Corp.*, 666 F.3d 1359, 1362 (D.C. Cir. 2012); *see also J.D. v. Azar*, 925 F.3d 1291, 1323–24 (D.C. Cir. 2019) ("It is settled that in a case involving joined, individual plaintiffs bringing a shared claim seeking a single remedy, Article III's case-or-controversy requirement is satisfied if one plaintiff can establish injury and standing." (internal citation omitted)).  As further explained below, Plaintiffs are asylum seekers who underwent credible fear interviews and who maintain that USCIS evaluators applied the unlawful provisions contained in the Lesson Plan to determine that each Plaintiff lacked a credible fear. Therefore, it is clear to this Court that Plaintiffs have suffered an injury in fact that is fairly traceable to the challenged Lesson Plan and that is likely to be redressed by a favorable ruling of this Court.

To start, there is no serious dispute that these Plaintiffs—who, again, allege that USCIS officers evaluated their asylum requests pursuant to unlawful Lesson Plan

provisions, after which each Plaintiff was slated for expedited removal from the United States based upon the officers' negative credible fear determinations—have adequately identified an injury in fact. This is because it is well established that a plaintiff has standing to bring a claim concerning a procedural injury if she can show that the agency failed to abide by a procedural requirement that was "designed to protect some threatened concrete interest" of the plaintiff. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573 n.8 (1992); *see also, e.g.*, *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 280 n.14 (1978) (concluding that an applicant for admission had standing to challenge a university's affirmative action admissions program even though the applicant "had been unable to prove that he would have been admitted in the absence of the [challenged] program"); *Grace v. Whitaker ("Grace I")*, 344 F. Supp. 3d 96, 119 (D.D.C. 2018), *aff'd in relevant part*, *Grace II*, 965 F.3d 883 (holding that plaintiffs had suffered an injury in fact because they alleged that new "credible fear policies impermissibly raise their burden and deny plaintiffs a fair opportunity to seek asylum and escape the persecution they have suffered").[10]

Consequently, Defendants' primary arguments with respect to Article III standing are that these Plaintiffs' alleged procedural injuries are not fairly traceable to the Lesson Plan, and that, in any event, an order from this Court vacating the Lesson Plan and requiring USCIS to undertake new credible fear determinations for these Plaintiffs would not actually redress those injuries. (*See* Defs.' Mot. at 27–29; *see also*

---

[10] Defendants' contention that Plaintiffs Kiakombua and Emma do not have an injury in fact because, sometime after the complaint was filed, the agency revisited and/or vacated the negative credible fear determination (*see* Defs.' Mot. at 25–26) sounds in mootness, not Article III standing. Thus, it is addressed in Section IV.A.2, *infra*.

Defs.' Reply at 10–12.). On the traceability front, Defendants attempt to assail the

factual basis for Plaintiffs' claim that it was the Lesson Plan that caused Plaintiffs'

alleged injuries; in this regard, Defendants argue that "Plaintiffs have produced zero

evidence that the Lesson Plan, and the new standards it allegedly pronounced, played

any role in Plaintiffs' negative credible fear determinations." (Defs.'s Mot. at 27.)  But

"[a] plaintiff who alleges a deprivation of a procedural protection to which he is

entitled never has to prove that if he had received the [proper] procedure the substantive

result would have been altered." *Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89,

94 (D.C. Cir. 2002).  Instead, "[a]ll that is necessary is to show that the procedural step

*was connected to* the substantive result." *Id.* at 95 (emphasis added).  And, here, there

is ample record evidence that connects the allegedly unlawful Lesson Plan provisions to

the credible fear determinations that the agency rendered with respect to each Plaintiff.

For one thing, it is clear that the April 2019 Lesson Plan was binding guidance

for USCIS asylum officers at the time that Plaintiffs' interviews were conducted.  *Cf.*

*Fed. Forest Res. Coal. v. Vilsack*, 100 F. Supp. 3d 21, 35 (D.D.C. 2015).  Indeed, the

April 2019 Lesson Plan became effective on April 30, 2019 (*see* Lesson Plan at 2), and

Plaintiffs' credible fear determinations took place between May and June of 2019 (*see*

Am. Compl., ¶¶ 8, 14, 21, 23, 25, 27).  Moreover, according to DHS, when making

credible fear assessments, "Asylum Officers must continue to refer to the latest

applicable RAIO Lesson Plans for the most recent guidance on determining asylum

eligibility." (Ex. 3 to Admin. Record, ECF No. 61-3, at 3.)  Plaintiffs have also offered

the sworn declaration of a retired USCIS supervisory asylum officer as proof that the

officers do, in fact, reference the Lesson Plan when making credible fear

31

determinations; the declarant explains that the agency "requires" officers to follow the Lesson Plan, and that USCIS uses it not only as a training material but also for disciplinary purposes.  (Ex. B to Pls.' Mot., ECF No. 36-3, at 76–78.)  Internal memoranda from DHS further reveal that USCIS performs a quality assurance "review of [credible fear] determinations *based on the revised lesson plan*[.]"  (Ex. 28 to Admin. Record, ECF No. 61-25, at 3 (emphasis added).)  Thus, the Court finds that the record evidence is sufficient to show that the challenged version of the Lesson Plan was in effect at the time that Plaintiffs' credible fear determinations were made, and that the Lesson Plan's prescriptions are binding on USCIS asylum officers, who use them to determine whether asylum seekers have a credible fear as is necessary to establish their asylum eligibility.  Accordingly, Plaintiffs have demonstrated the requisite connection between the Lesson Plan and their alleged harm, and have therefore established traceability for the purpose of the Article III standing inquiry.  *See Mendoza v. Perez*, 754 F.3d 1002, 1012 (D.C. Cir. 2014) (explaining that a plaintiff "need not show the agency action would have been different had it been consummated in a procedurally valid manner—the courts will assume this portion of the causal link").

Defendants' redressability argument is likewise unavailing.  Again, Plaintiffs are not asking the Court to require "DHS [to] reach any particular decision" about their credible fear of persecution or torture; instead, they are merely requesting that this Court order that the agency afford the procedures and "the consideration that they are due under the statute." *Ramirez v. I.C.E.*, 338 F. Supp. 3d 1, 31 (D.D.C. 2018). Defendants argue nevertheless that Plaintiffs' alleged injury is not redressable, because even if the Court requires USCIS asylum officers to evaluate Plaintiffs' asylum

eligibility without reference to the allegedly tainted Lesson Plan provisions, such an order does not pertain *to the immigration judge's subsequent review* of the asylum officer's determination, and thus addresses "only one of two government actions that both independently produce the same alleged harm." *Kaspersky Lab, Inc. v. Dep't of Homeland Sec.*, 311 F. Supp. 3d 187, 219 (D.D.C. 2018). (*See also* Defs.' Mot. at 29 (emphasizing that "it was the Immigration Judge—not a USCIS asylum officer—who made the ultimate call on whether each Plaintiff had a negative credible fear of persecution or torture").) In so arguing, Defendants once again misconstrue the relevant injury, which is *not* the substantive determination regarding each Plaintiff's lack of a credible fear, but the asylum officer's application of the allegedly unlawful Lesson Plan when each Plaintiff's credible fear determination was made. *See Ctr. for Biological Diversity v. E.P.A.*, 861 F.3d 174, 184–85 (D.C. Cir. 2017). And *that* harm occurred at the point in which the asylum officer referenced the allegedly unlawful Lesson Plan provisions, so it would be fully redressed by a court order that requires new credible fear interviews for these Plaintiffs conducted by officers who do not rely upon such allegedly unlawful standards when Plaintiffs' asylum eligibility is assessed.[11]

---

[11] It is also worth noting that, under the current statutory scheme, the asylum officer's adverse credible fear finding and the immigration judge's affirmance of that finding are *not* wholly independent: the immigration judge's review occurs only after an asylum officer has made a negative credible fear finding, and that review is based primarily, if not exclusively, on the "record of the [asylum officer's] negative credible fear determination[.]" 8 C.F.R. § 1208.30(g)(2)(ii). Congress also intended for this "de novo" review by the immigration judge to be quite cursory—*i.e.*, "[it] is meant to conclude within 24 hours" of the adverse credible fear finding, *MTRNY II*, 962 F.3d at 619—such that, in practice, the review amounts to "simply check[ing] a box on a form stating that the immigration officer's decision was 'Affirmed[,]'" *Thuraissigiam v. Dep't of Homeland Sec.*, 917 F.3d 1097, 1118 (9th Cir. 2019), *rev'd on other grounds*, 140 S. Ct. 1959 (2020). Thus, even if the relevant harm was Plaintiffs' negative credible fear determinations, the interdependent nature of the initial adverse finding and the immigration judge's review means that the latter cannot be reasonably construed as a separate, intervening cause of that injury.

In short, if Plaintiffs' claim that the USCIS asylum officers who undertook to determine whether they each had a credible fear of persecution or torture could not lawfully reference the Lesson Plan when making that determination—as the Court must assume for the purpose of evaluating standing, *see City of Waukesha v. E.P.A.*, 320 F.3d 228, 235 (D.C. Cir. 2003)—then these Plaintiffs (to whom the Lesson Plan was applied with respect to the adverse credible fear determination that each asylum officer made) have established a procedural injury in fact that is fairly traceable to the challenged agency action, and which an order of this Court could potentially redress.

    2.  <u>Defendants Have Not Persuasively Demonstrated Mootness</u>

In the realm of threshold jurisdictional contentions, Defendants also insist that subsequent developments with respect to each Plaintiff have mooted all of the claims that appear in Plaintiffs' complaint.  (*See* Defs.' Reply at 12; *see also* Defs.' Mootness Notice at 1.)  To hear Defendants tell it, "the challenged Lesson Plan is no longer causing" Plaintiffs Kiakombua, Emma, and Ana "any legally cognizable injury[,]" because they have "each received the relief they requested" (Defs.' Reply at 12–13; *see also* Defs.' Mootness Notice at 1–4) insofar as USCIS has placed them "into full § 1229a removal proceedings by filing a Notice to Appear" (Defs.' Reply at 13 (internal quotation marks and citation omitted)).  At the other end of the spectrum, Defendants argue that, because Julia and Sofia "have [already] been removed" from the United States, the consequences of the allegedly tainted adverse credible fear determination have already played out with respect to them, rendering their legal claims moot.  (Defs.' Mootness Notice at 4.)  Notably, it is Defendants' "heavy burden" to show that there is no longer any case or controversy with respect to a plaintiff's claims, *Honeywell Int'l,*

*Inc. v. Nuclear Regul. Comm'n*, 628 F.3d 568, 576 (D.C. Cir. 2010) (internal quotation marks and citation omitted), and the Supreme Court has made clear that, "[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot[,]" *Chafin v. Chafin*, 568 U.S. 165, 172 (2013).  This Court finds that Defendants have not carried the heavy burden of establishing mootness, for the following reasons.

First of all, Defendants have not demonstrated that Kiakombua, Emma, and Ana have actually been placed into full removal proceedings.  The relevant statutory and regulatory provisions plainly establish not only that "[e]very removal proceeding . . . is commenced by the filing of a notice to appear with the immigration court[,]" 8 C.F.R. § 1239.1(a), but also that notice of "the time, place, and date of [the] hearing" must be given to the noncitizen before the commencement of removal proceedings, 8 C.F.R. § 1003.18(b); *see also* 8 U.S.C. § 1229(a)(1) (stating that, "[i]n removal proceedings under section 1229a . . . , written notice (in this section referred to as a 'notice to appear') shall be given in person to the alien . . . specifying . . . [t]he time and place at which the proceedings will be held").  Yet, the Notices to Appear that Defendants have provided to this Court do not contain a time or a date for Plaintiffs' removal hearings, and only Kiakombua's and Ana's Notices to Appear have been filed with the immigration court.  (*See* Kiakombua NTA at 2; Ana's NTA at 2; Emma's NTA at 2.)  In other contexts, the Supreme Court has made clear that, "[i]f the three words 'notice to appear' mean anything . . . , they must mean that, at a minimum, the Government has to provide noncitizens 'notice' of the information, *i.e.,* the 'time' and 'place,' that would enable them 'to appear' at the removal hearing in the first place."  *Pereira v. Sessions*,

138 S. Ct. 2105, 2115 (2018).  Thus, a Notice to Appear that is incapable of triggering the initiation of a removal proceeding—such as the ones provided to Plaintiffs Kiakombua, Ana, and Emma—do not suffice to establish that these Plaintiffs are presently in full removal proceedings within the meaning of the INA, such that their claims have become moot.

The cases that Defendants rely upon to support their mootness assertion with respect to these Plaintiffs are non-binding precedents from other jurisdictions and are also wholly inapposite.  In *Pierre-Paul v. Barr*, 930 F.3d 684 (5th Cir. 2019), for example, the Fifth Circuit held that a noncitizen could not challenge the immigration judge's jurisdiction on appeal on the grounds that a statutorily defective Notice to Appear had been filed with the immigration court.  Although the panel held that, under the applicable regulations, a Notice to Appear that lacks time-and-place information may be sufficient to vest jurisdiction in the immigration court, *see id.* at 689–90, that holding says nothing about whether, per the INA and its implementing regulations, the agency must provide notice of the time and place of the full removal hearing and file that notice with the immigration court in order for a noncitizen to be deemed to have been placed in full removal proceedings, *see* 8 C.F.R. §§ 1003.18(b), 1239.1.  And, indeed, "Congress's decision to nest 'service' of an NTA under '[i]nitiation of removal proceedings' suggests . . . that Congress intended for *service*" of a statutorily compliant Notice to Appear "to operate as the point of commencement for removal proceedings." *Perez-Sanchez v. U.S. Att'y Gen.*, 935 F.3d 1148, 1154 (11th Cir. 2019).  And "the agency [is] not free to redefine the point of commencement[,]" *id.*, because "[i]f Congress has defined a term, then an implementing regulation cannot re-define that

term in a conflicting way[,]" *Ortiz-Santiago v. Barr*, 924 F.3d 956, 961 (7th Cir. 2019).

Even if one assumes that the statutorily defective Notices to Appear that were issued to Kiakombua, Ana, and Emma after commencement of the instant case were sufficient to trigger full removal proceedings for these Plaintiffs, it is not at all clear that the legal claims concerning the Lesson Plan have been mooted as a result. *See O.A. v. Trump*, 404 F. Supp. 3d 109, 139–40 (D.D.C. 2019) (holding that the issuance of a Notice to Appear *after* a complaint has been filed does not moot a plaintiff's section 1252(e)(3) challenge). If there is *any* possibility that the prior adverse credible fear determination could be used to thwart Plaintiffs' efforts to obtain full consideration of their asylum applications, then their claims are not moot, and, here, the credible fear findings appear to remain a part of each Plaintiff's record. (*See* Ex. 8 to Admin. Record, ECF No. 61-8, at 19–20 (explaining that USCIS maintains "A-files of detained aliens[,]" which include the asylum officer's "Interview Notes—non-Q&A and Q&A format, both handwritten and typed[,]" "Comments . . . regarding negative credible fear determination[,]" and a "Memo of Adverse Information, if any."); Ex. 11 to Admin. Record, ECF No. 61-10, at 3 (showing that, as part of USCIS's "Record of Determination/Credible Fear Worksheet" (Form I-870), asylum officers inform noncitizens that "[t]he statements [they] make today [at the credible fear interview] may be used in deciding [their] claim and in any future immigration proceedings").) The Court also agrees with Plaintiffs' argument that, by focusing exclusively on the purported limitations on USCIS's ability to switch these Plaintiffs' statuses unilaterally at this point in the process (without making any similar representations concerning the power of any *other* defendant-agency to do so (*see* Defs.' Mootness Notice at 3; Defs.'

Reply at 14)), "Defendants have failed to carry their burden of proving that there is no possibility that the women could be returned to expedited removal" (Pls.' Reply at 16). *Cf. United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953) (holding that such a disclaimer "does not suffice to make a case moot although it is one of the factors to be considered").

Furthermore, to be clear: it is not *Plaintiffs'* responsibility to establish a non-speculative possibility of their being returned to expedited removal status, as Defendants suggest.  (*See* Defs.' Mootness Notice at 3.)  Rather, "a court may not conclude that a defendant's voluntary cessation of disputed conduct renders a case moot unless *the party urging mootness* demonstrates[,]" among other things, that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Zukerman v. U.S.P.S.*, 961 F.3d 431, 442–46 (D.C. Cir. 2020) (emphasis added) (internal quotation marks and citation omitted); *see also Hardaway v. D.C. Hous. Auth.*, 843 F.3d 973, 980 (D.C. Cir. 2016) (rejecting the "tactic" of "attempting to foist [the] burden onto" plaintiffs to establish that a case is not moot).  And not only have Defendants failed to make such showing under the instant circumstances, but Plaintiffs' counsel avers that there have, in fact, been instances where "DHS has taken individuals in § 1229a proceedings and put them in expedited removal[.]"  (Pls.' Resp. to Defs.' Mootness Notice at 3.)  Therefore, this Court concludes that Defendants have failed to show that the claims Kiakombua, Ana, and Emma have brought are now moot.

Defendants' argument that Sofia's and Julia's removals from the United States have mooted their legal claims is even less persuasive.  The D.C. Circuit permits the continuation of similar challenges by noncitizens whom the government has already

removed.  *See, e.g.*, *Am. Immigr. Laws. Ass'n v. Reno ("AILA II")*, 199 F.3d 1352, 1363 (D.C. Cir. 2000) (noting that, "[w]hen an alien returned to his native country, nothing prevented him from bringing suit here" under section 1252(e)(3) of the INA). Moreover, this Court has little doubt that it could grant Sofia and Julia effective relief notwithstanding the fact that they have been returned to their home countries; for instance, the Court could order "the government to return to the United States the plaintiffs who were unlawfully deported and to provide them with new credible fear determinations consistent with the immigration laws." *Grace I*, 344 F. Supp. 3d at 105, *aff'd in relevant part*, *Grace II*, 965 F.3d at 909.  It is also clear that the Court's alleged lack of authority to issue the requested relief does not render a legal claim moot.  The scope of relief "goes to the meaning of the [applicable statute] and the legal availability of a certain kind of relief[,]" and it "confuses mootness with the merits" to argue that the case no longer presents a live controversy because the court does not have the authority to grant the requested relief.  *Chafin*, 568 U.S. at 174.

Finally, this Court notes that moving a noncitizen from expedited removal to full removal proceedings does not necessarily portend dismissal (on mootness grounds) of a noncitizen's challenge to expedited removal procedures.  In the immigration context, courts have consistently recognized the compelling concern that an agency whose removal practices are challenged in court can effectively insulate itself from judicial review by acting quickly to issue Notices to Appear or to expedite removal, and then arguing that the court thereby lacks jurisdiction over those plaintiffs' legal claims.  *See O.A.*, 404 F. Supp. 3d at 140 (rejecting the argument that the court "would lose jurisdiction under § 1252(e)(3) if the government moves the plaintiff from expedited to

full removal proceedings—up to the moment the Court enters final judgment"—because "[t]hat reading of the statute would attribute to Congress an intent to empower the government to avoid an unfavorable decision at any time," and "[c]onsidered against the backdrop of the usual rule, which fixes statutory jurisdiction at the time the complaint is filed, that contention is a step too far").  In any event, at a minimum, this concern raises the specter of a standard exception to mootness: the "capable of repetition yet evading review" doctrine.  *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 322 (D.C. Cir. 2009) (internal quotation marks and alterations omitted). As Plaintiffs note (*see* Pls.' Resp. to Defs.' Mootness Notice at 7 n.6), Defendants issued Notices to Appear to Kiakombua first, and then to Ana and Emma, within days of learning about this lawsuit, presumably in an effort to moot their claims, which is precisely what the "capable of repetition yet evading review" exception seeks to avoid. *See Del Monte*, 570 F.3d at 322 (holding that a plaintiff may avoid dismissal by demonstrating that "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party would be subjected to the same action again" (internal quotation marks, citation, and alteration omitted)).

## B.   This Court Has Subject-Matter Jurisdiction To Review Agency Action That Allegedly Violates Provisions Of The INA

The final threshold disagreement between the parties in this case centers around the scope and meaning of section 1252 of Title 8 of the United States Code, and the extent to which that statutory provision preserves, or eliminates, this Court's subject-matter jurisdiction over Plaintiffs' claims concerning the Lesson Plan.  Plaintiffs maintain that "[t]he Lesson Plan is reviewable under the plain text of 8 U.S.C.

§ 1252(e)(3)[,]" which "expressly authorize[s] judicial review of 'Challenges on the validity of the [expedited removal] system'" and, in particular, challenges to written regulations, policy directives, or guidelines that "implement" the expedited removal statute (Pls.' Mot. at 23); according to Plaintiffs, this grant of authority plainly encompasses "[judicial] review of a written policy and procedure (the Lesson Plan) issued by the Secretary of Homeland Security (through its component USCIS) to implement" the asylum aspect of the expedited removal scheme (*id.* at 23–24). Defendants respond that, while the Court might otherwise have had subject-matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331, "the INA precludes the Court from exercising jurisdiction over this case" *precisely because* Plaintiffs' claims concern the agency's practices with respect to screening individuals for expedited removal. (Defs.' Mot. at 30.)  In this regard, Defendants point to the fact that the INA (specifically, 8 U.S.C. § 1252(a)(2)(A)) "bars district-court jurisdiction in cases involving orders of expedited removal, other than as permitted by section 1252(e)"—a subdivision that Defendants read as authorizing "review only of regulations and written policies that *establish* the structure and procedures for the expedited removal system." (*Id.* (emphasis added)).  In other words, in Defendants' view, section 1252(e) is the only potential basis for the exercise of this Court's subject-matter jurisdiction over Plaintiffs' claims in light of section 1252(a)(2)(A), and the Court lacks jurisdiction under section 1252(e)(3) because the Lesson Plan "does not 'implement' the expedited removal statute[.]"  (*Id.* at 30–31.)  Defendants further maintain that the Lesson Plan does not satisfy section 1252(e) because it "is not a . . . regulation, policy directive, policy guideline, or procedure" and "Plaintiffs' credible fear findings are not

reviewable expedited-removal 'determinations'" (*id.*), and, regardless, Plaintiffs have brought these claims more than 60 days after the alleged implementation of the challenged instructions (*see* Defs.' Reply at 17).

Defendants are correct to observe, at the outset, that section 1252 plainly expresses Congress's intention to strip federal courts of jurisdiction over the expedited removal process "*except as provided in subsection (e)*[.]"  8 U.S.C. § 1252(a)(2)(A) (emphasis added).  As relevant here, subsection (e) of section 1252 states:

> (e)  Judicial review of orders under section 1225(b)(1)
>
> . . .
>
> > (3)  Challenges on validity of the system
> >
> > > (A)  In general
> > >
> > > Judicial review of determinations under section 1225(b) of this title and its implementation is available in an action instituted in the United States District Court for the District of Columbia, but shall be limited to determinations of—
> > >
> > > > (i)  whether such section, or any regulation issued to implement such section, is constitutional; or
> > > >
> > > > (ii)  whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law.
> > >
> > > (B)  Deadlines for bringing actions
> > >
> > > Any action instituted under this paragraph must be filed no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure described in clause (i) or (ii) of subparagraph (A) is first implemented.

*Id.* § 1252(e)(3)(A)–(B).  However, as explained below, Defendants' contentions about the effect of section 1252(e) with respect to the scope of this Court's subject-matter jurisdiction miss the mark, and this is especially so in light of intervening D.C. Circuit

case law that illuminates the contours of section 1252(e)(3).  In sum, this Court maintains its view that 28 U.S.C. § 1331 provides subject-matter jurisdiction over Plaintiffs' claims, *see Make the Rd. N.Y. v. McAleenan ("MTRNY I")*, 405 F. Supp. 3d 1, 26–27 (D.D.C. 2019), *aff'd in relevant part*, *MTRNY II*, 962 F.3d at 624–25, and that section 1252 of Title 8 does not strip federal courts of jurisdiction where, as here, the claims at issue concern a written policy directive, guideline, or procedure that implements the statutory expedited removal process, and are brought no later than 60 days after the agency promulgates the challenged policy or procedure.

      1.    Section 1252(e)(3)(A) Of The INA Preserves This Court's Subject-Matter Jurisdiction Under 28 U.S.C. § 1331 In These Circumstances

The scope and purpose of the judicial review that the text of section 1252(e)(3) expressly preserves is addressed in the legislative history of the provision.  Senator Orin Hatch explained that "[i]t was very important to [the drafters] that there be judicial review of the implementation of the[] provisions" of the INA concerning expedited removals, because, "[a]lthough review should be expedited, the INS and the Department of Justice should not be insulated from review."  142 Cong. Rec. S11,491 (daily ed. Sept. 27, 1996) (statement of Sen. Hatch).  In this regard, the D.C. Circuit has recently held (not once but twice) that, "although much of section 1252 limits and channels judicial relief directly into the federal appellate courts or habeas corpus proceedings, subsection (e)(3) expressly provides in the expedited removal context for more traditional judicial review of challenges on validity of the system, including agency policies governing credible-fear interviews."  *Grace II*, 965 F.3d at 891 (internal quotation marks, citations, and alterations omitted); *see also MTRNY II*, 962 F.3d at

625.  Thus, whether section 1252(e)(3) is interpreted as a jurisdiction-granting provision, *see id.* at 630, or as a provision that preserves the pre-existing jurisdiction of the Court in the context of the INA's other jurisdiction-stripping provisions, *see id.* at 624–25, it is clear that, per the language of section 1252(e)(3), this Court has jurisdiction to review the kinds of agency actions and legal challenges that that particular subdivision addresses, *see id.* at 624–30.

Of course, Defendants contend that Plaintiffs' challenges to the Lesson Plan do not fit within section 1252(e)(3)(A)'s prescribed judicial-review authorization, because the Lesson Plan is not a "written policy directive, written policy guideline, or written procedure" that "implement[s]" the expedited removal system that section 1225(b) establishes.  (*See* Defs.' Mot. at 30–36.)  This argument has little force, however, both because of the plain language of section 1252(e)(3) and also due to the D.C. Circuit's reasoning in a recent binding opinion in *Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020).

*Grace* involved a challenge to "a host of executive-branch policies adopted to implement the expedited-removal provisions" of the INA, including a ruling by the Attorney General and a guidance document that USCIS issued concerning that adjudication.  *Grace II*, 965 F.3d at 887, 889–90 (addressing *Matter of A-B-*, 27 I. & N. Dec. 316, 321 (A.G. 2018), wherein the Attorney General had laid out new policies concerning asylum claims based on persecution by non-state actors on account of an applicant's membership in a particular social group).  With respect to the Attorney General's ruling, the D.C. Circuit held that *A-B-* qualified as an "implementation" of section 1225(b) within the meaning of section 1252(e)(3), because *A-B-* "expressly references the credible-fear standard and asylum officers' role in implementing the

44

expedited-removal system[,]" and its "overarching purpose, moreover, is to interpret

section 1158's phrase 'membership in a particular social group,' which Congress

incorporated into section 1225(b)[.]"  *Id.* at 895.  The D.C. Circuit panel also concluded

that *A-B-* qualified as a "written policy directive" or "written policy guideline" under

section 1252(e)(3), because "agencies can and do announce new policies in

adjudications[,]" especially in the immigration context, and if "the Attorney General

could immunize credible-fear policies from judicial review by simply announcing them

in section 1229a adjudications[,]" that "result would conflict with section 1252(e)(3)'s

purpose" and text.  *Id.*  The D.C. Circuit further held that the related USCIS guidance

document was a "written policy directive" or "guideline" that implements section

1225(b), because the document cited to section 1225(b), "describe[d] itself as a 'policy

memorandum' that 'provides guidance' to USCIS officers[,]" and "instruct[ed] 'all

USCIS employees' on how to apply *A-B-* 'consistent[ly]' throughout several types of

proceedings, including 'credible fear . . . adjudications.'"  *Id.* at 892 (internal citations

and emphasis omitted).

Drawing from the D.C. Circuit's analysis in *Grace II*, it is clear to this Court that

the Lesson Plan also qualifies as a "written policy directive, written policy guideline, or

written procedure" that implements the expedited removal scheme and thus can be

challenged in federal court under section 1252(e)(3).  8 U.S.C. § 1252(e)(3)(A)(ii).  To

begin with, the plain meaning of the statutory terms "directive" and "guideline" sweeps

broadly.  *See, e.g.*, *Directive*, Merriam-Webster Unabridged Dictionary (online ed.

2020) (defining "directive" as, *inter alia*, "something that serves to direct, guide, and

usually impel toward an action, attainment, or goal"); *Guideline*, Merriam-Webster

Unabridged Dictionary (online ed. 2020) (explaining that "guideline" is, with respect to a government action, "an indication or outline of future policy or conduct"); *cf. Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 93 (D.C. Cir. 1997) (defining the term "guidance" in the APA context as "a general statement of policy").  Consistent with the breadth of this plain language, courts in this circuit have generally suggested that the primary statutory limitation on the types of policies concerning an agency's expedited removal practices that can be challenged pursuant to that section is not the type of document that announces the policy, but the fact that any such policy must be written down.  *See, e.g.*, *Am. Immigr. Laws. Ass'n v. Reno ("AILA I")*, 18 F. Supp. 2d 38, 58 (D.D.C. 1998) (holding that "unwritten" policies are unreviewable), *aff'd*, *AILA II*, 199 F.3d 1352.  In addition, *Grace II* tangentially involved DHS policies that had been included in a prior version of the Lesson Plan at issue here, and the Circuit expressly indicated a lack of actual (or serious) dispute concerning whether that version of the Lesson Plan "reflect[s] USCIS's consistent practice"—and thus qualifies as a policy or procedure—especially given that, in *Grace II*, USCIS "nowhere claim[ed] that immigration officials were free to depart" from the Lesson Plan.  *Grace II*, 965 F.3d at 902 (internal quotation marks and citations omitted).

Here, government counsel struggles valiantly to suggest that USCIS asylum officers *do* have such freedom: he points out that the Lesson Plan "do[es] not carry the force of law" (Defs.' Mot. at 22), and argues that it "does not ordain or enact any policy" (Defs.' Reply at 15), but is merely an "interpretive material" that "just states the law, as pronounced by statutes, regulations, and case law" (Defs.' Mot. at 32–33).  Those assertions (which contradict the position that the government took in *Grace II*)

are difficult to square with internal DHS memoranda that plainly indicate that the agency itself understands the Lesson Plan to be binding on asylum officers. (*See, e.g.*, Ex. 28 to Admin. Record, ECF No. 61-25, at 3; Ex. 3 to Admin. Record, ECF No. 61-3, at 3.) Defendants fail to point to a single piece of evidence that supports their current contention that the Lesson Plan is not binding on the officers that are required to apply its prescriptions when they make credible fear determinations—and, to the contrary, all of the evidence in front of this Court—including DHS internal memoranda—suggests otherwise. *See CropLife Am. v. E.P.A.*, 329 F.3d 876, 883 (D.C. Cir. 2003) ("[T]he agency's characterization of its own action is not controlling if it self-servingly disclaims any intention to create a rule with the 'force of law,' but the record indicates otherwise."). And to the extent that the Lesson Plan's provisions *are* binding on asylum officers, they are not reasonably characterized as something other than a written policy directive, guidance, or procedure, as Defendants now maintain.

Nor does it matter that the Lesson Plan is part of the "Asylum Division Officer Training Course," and that training materials are not *explicitly* listed as reviewable documents under section 1252(e)(3)(A)(ii). (*See* Defs.' Mot. at 32–33.) The Lesson Plan itself belies Defendants' argument, insofar as its express purpose is "to explain" to asylum officers how to make a credible fear determination. (Lesson Plan at 2.) Thus, there can be no doubt that the document is intended to guide and direct asylum officers in making those determinations. It is also well established that the particular label that an agency chooses to affix to a challenged policy is not dispositive of whether a written policy document falls within the purview of section 1252(e)(3) of the INA, as the D.C. Circuit made clear. *See Grace II*, 965 F.3d at 895–96. Given this, and also the

established fact that asylum officers are required to follow the Lesson Plan's guidance in this regard, the Lesson Plan unquestionably counts as a written policy directive, policy guideline, or procedure within the meaning of section 1252(e)(3) of the INA.

The Court is also compelled to conclude that the Lesson Plan "implements" the expedited removal statute for the purpose of section 1252(e)(3)(A). Consistent with the D.C. Circuit's holding in *Grace II*, an agency's written recitation of its understanding of the substantive and procedural standards of asylum law that pertain to credible fear determinations is an implementation of the various procedures that section 1225(b) requires. *See Grace II*, 965 F.3d at 892. The Lesson Plan is doing exactly that, insofar as it is specifically designed to help the asylum officers whom section 1225(b) charges with making credible fear determinations to fulfill that responsibility. Defendants' responsive contention that the Lesson Plan does not qualify as an implementation of the expedited removal scheme because an "'implementation' involves *intentional* action to accomplish a specific obligation, not a collateral consequence of actions taken to accomplish a different goal" (Defs.' Mot. at 31 (emphasis added and citation omitted))—an argument that was not raised in *Grace II*—is mistaken, because neither the ordinary meaning of the word "implementation" nor the text of section 1252(e)(3)(A) includes such a specific intent requirement. *See* Bryan A. Garner, *A Dictionary of Modern Legal Usage* 422 (2d ed. 2001) (explaining that the verb "to implement" ordinarily means "to carry out"); *Implement*, Merriam-Webster Unabridged Dictionary (online ed. 2020) (defining "implement" as, *inter alia*, to "give practical effect to and ensure of actual fulfillment by concrete measures"); *see also Grace II*, 965 F.3d at 892 (determining whether an agency action was an "implementation" of section

1225(b) without considering whether it was the agency's intent to implement that provision).

In any event, even if Defendants are right that intentionality is required for implementation under section 1252(e)(3), there is no question that, by issuing the Lesson Plan, the agency intends to facilitate the first stage of the asylum review process that section 1225(b) establishes: the very first page of the training manual announces that the agency's "purpose" in providing this Lesson Plan regarding credible fear determinations is "to explain how to determine whether an alien subject to expedited removal . . . has a credible fear of persecution or torture" (Lesson Plan at 2), which is a task that an asylum officer has the indisputable duty to perform pursuant to the expedited removal scheme established in 8 U.S.C. § 1225(b).  Moreover, and perhaps even more significantly, in the course of articulating what Plaintiffs maintain are new and unlawful principles for evaluating credible fear, the Lesson Plan *repeatedly and specifically cites section 1225(b)* and explicitly references the statutory standard for credible fear determinations.  (*See, e.g.*, Lesson Plan at 6, 9, 12, 14, 19.)  *Cf. Grace II*, 965 F.3d at 892 (relying on similar statements of purpose and citations to determine whether a particular agency action "implements" section 1225(b)).  Thus, USCIS plainly intended the Lesson Plan to be used by its agents to carry out the task of making credible fear assessments pursuant to section 1225(b), and as a result, this Court concludes that the Lesson Plan is properly construed as a written policy directive, guideline, or procedure that implements the provisions of the expedited removal statute for the purpose of section 1252(e)(3).

2.    Plaintiffs' Claims Are Not Time-Barred

In their reply brief, Defendants pivot to yet another potential basis for asserting that section 1252(e)(3)'s judicial review requirements are not satisfied under the circumstances presented here; they contend that "Congress has imposed a jurisdictional requirement that these challenges be filed 'no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure . . . is *first* implemented[,]'" but "most of the 2019 Lesson Plan has been operative for years, to say nothing of the underlying statutes, regulations, external policies, and other materials cited in the Lesson Plan, much of which has also been operative for years."  (Defs.' Reply at 17 (emphasis in the original).)[12]  Assuming *arguendo* that the 60-day requirement of section 1252(e)(3)(B) is jurisdictional in nature—which is not at all clear, given that section 1252(e)(3) does not speak in jurisdictional terms, *see MTRNY I*, 405 F. Supp. 3d at 26, *rev'd on other grounds*, *MTRNY II*, 962 F.3d 612; *see also United States v. Kwai Fun Wong*, 575 U.S. 402, 410 (2015) (observing that "most time bars are nonjurisdictional"); *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012) (suggesting that courts should "press[] a stricter distinction between truly jurisdictional rules . . . and nonjurisdictional claim-processing rules" (internal quotation marks omitted)); *but see Vijender v. Wolf*, No. 19-cv-3337, 2020 WL 1935556, at *2–6 (D.D.C. Apr. 22,

---

[12] Defendants reference the 60-day requirement in their opening brief, but do not assert that the time bar forecloses Plaintiffs' claims in that context.  (*See* Defs.' Mot. at 33–34.)  Rather, Defendants mention that part of section 1252(e)(3) initially simply and solely to support their argument about the intended meaning of the statutory term "implementation."  (*See id*. at 33 (asserting that "[t]he operation of the statute of limitations under section 1252(e)(3) makes it all the more apparent that Congress did not intend that an interpretation of the asylum or CAT standard in administrative training materials constitutes a new implementation of section 1225(b)(1)").)  The first invocation of the 60-day timeframe as a potential independent bar to the Court's consideration of the merits of Plaintiffs' claims appears in Defendants' reply brief.  (*See* Defs.' Reply at 18–19.)

2020) (concluding that the 60-day bar is jurisdictional)—Defendants' insistence that Plaintiffs' claims concerning the Lesson Plan have been brought outside of the prescribed 60-day window are far off base.

First of all, per the plain text of section 1252(e)(3), a legal claim concerning a written policy directive, guidance, or procedure that implements the expedited removal system is timely if the "action" is brought "no later than 60 days after the date the *challenged* section, regulation, directive, guideline, or procedure . . . is first implemented."  8 U.S.C. § 1252(e)(3)(B) (emphasis added).  Defendants have yet to explain how language that appeared in the Lesson Plan for the first time in April of 2019 could possibly have been challenged previously.  And, indeed, it is clear from both the text and operation of section 1252(e)(3)(B) that, by enacting that provision, Congress merely intended to limit the timing of court challenges to within 60 days of when any *particular* policy prescription "first" issues.

Plaintiffs' legal action unquestionably fits within that timeframe.  The original complaint in this case was filed on June 25, 2019 (*see* Compl., ECF No. 1, at 21)— within 60 days of April 30, 2019, which is the date that is listed on the first page of the relevant version of the Lesson Plan (*see* Lesson Plan at 2).  Defendants concede that "this challenge was brought within 60 days of the April 30th Lesson Plan being sent out" (Hr'g Tr., ECF No. 65, at 41:4–5), and the D.C. Circuit has held that the 60-day period in section 1252(e)(3)(B) begins to run on the "effective date" of the relevant regulation or written policy, *AILA II*, 199 F.3d at 1355 (holding that, because the challenged regulation was "effective April 1, 1997," a challenge to that regulation "had to be filed no later than sixty days after April 1").  Thus, the claims in Plaintiffs'

complaint, which concern an amended Lesson Plan that the agency first sent out less than 60 days prior to the filing of this lawsuit, are timely.

There is really no basis in law or logic for Defendants to suggest otherwise. Nevertheless, Defendants argue that section 1252(e)(3)(B) requires the Court to determine *which* of the amended "parts of a reviewable agency document are [*actually*] new" (Defs.' Reply at 18), as distinguished from those amended sections that are substantially similar to the prior iteration because, for example, only "some language on the margins" has changed (Hr'g Tr. at 41:23–25).  To support this contention, defense counsel emphasizes that the agency has "discretion to reword" its guidance documents, and argues that it should be able to do so without restarting the 60-day clock.  (*Id.* at 42:7.)  In the agency's view, then, the Court must "figure out [what] degree of deviance" there is between the prior version of a written policy provision and the challenged amendment in order to determine whether such changes are sufficiently substantive to restart the statutory clock.  (*Id.* at 43:14–15.)

Nothing in the statute requires this result.  In particular, section 1252(e)(3) plainly authorizes judicial review of written policies, guidelines, or procedures that implement the expedited removal statute, without regard to whether such policies deviate substantively from an agency's prior practices.  Thus, consistent with binding precedent, the "first" implementation language in section 1252(e)(3)(B) need not, and should not, be read that broadly.  *Cf. MTRNY II*, 962 F.3d at 623–24 (explaining that the strong "presumption favoring judicial review of administrative action" applies "even where, as here, the statute expressly prohibits judicial review—in other words, the presumption dictates that such provisions must be read narrowly" (internal quotation

marks and citation omitted)).  Accordingly, all that is necessary for timeliness under section 1252(e)(3)(B) is what indisputably happened here: that the lawsuit Plaintiffs have filed to challenge aspects of an agency's written policy directive concerning implementation of the expedited removal scheme is brought within 60 days of when the agency issues the document that contains the challenged prescriptions.

## C.    The Lesson Plan Violates The INA And Its Implementing Regulations

Having determined that Plaintiffs have Article III standing to bring the claims in this lawsuit, that Plaintiffs' claims are not moot, and that the Court has subject-matter jurisdiction to consider Plaintiffs' legal challenge (*see supra* Sections IV.A–B), the Court now turns to the merits of the complaint's contention that the Lesson Plan is unlawful.  As a reminder, Plaintiffs have cited alternative and independent grounds for this proposition, beginning with the contention that certain provisions of the Lesson Plan are "not consistent with the governing [immigration] statutes and regulations" pursuant to section 1252(e)(3).  (Pls.' Mot. at 39; *see also* Am. Compl. ¶ 90.)[13]

To substantiate this particular claim, Plaintiffs' complaint sets out various examples of ways in which the Lesson Plan allegedly transgresses the INA and its

---

[13] The parties here appear to agree that section 1252(e)(3) creates a cause of action to review the Lesson Plan's consistency with the INA (as amended) and its implementing regulations.  (*See* Defs.' Mot. at 55 (noting that section 1252(e)(3) is "the only available cause of action" for Plaintiffs' claims); *see also* Pls.' Mot. at 39.)  This Court has previously doubted whether section 1252(e)(3)'s reference to judicial review of claims that agency's written policies are "otherwise in violation of law" means that "Congress sought to permit plaintiffs to police DHS's compliance with the universe of potentially applicable legal requirements under circumstances in which there would have otherwise been no relief with respect to that violation[.]"  *MTRNY I*, 405 F. Supp. 3d at 38.  But, regardless, section 1252(e)(3) contains an express cause of action for the claim that the agency's policy prescriptions are "not consistent with [the] applicable provisions of" the INA, 8 U.S.C. § 1252(e)(3)(ii), and *that* cause of action (which also "exists, presumptively, with respect to every statute that confers guided discretion upon agency actors") "necessarily relates to the substantive standards that the INA itself prescribes." *MTRNY I*, 405 F. Supp. 3d at 38 n.20 (citing 8 U.S.C. § 1252(e)(3)(ii)).

implementing regulations.  (*See, e.g.*, Am. Compl. ¶ 85(c) (asserting that the Lesson

Plan "directs asylum officers to make negative credible fear determinations based on

what are actually discretionary factors, not eligibility criteria" (emphasis omitted)); *id.*

¶ 83 (arguing that the Lesson Plan "increases the evidentiary burden the asylum seeker

must carry to pass a credible fear screening"); *see also* Pls.' Mot. at 39–50 (expounding

further upon the alleged conflict between the credible fear standards in the Lesson Plan

and those established by the INA and its related regulations).)  For their part,

Defendants argue that there is no inconsistency between the provisions of the Lesson

Plan and the relevant substantive statutes and regulations.  (*See generally* Defs.' Mot. at

48–54; Defs.' Reply at 32–40.)

As explained below, this Court finds that Plaintiffs have the better of this

argument.  In reaching that conclusion, the Court has applied the well-worn deference

framework that governs a federal court's determination of whether or not an agency has

faithfully interpreted the law in relation to its own pronouncements.  *See Grace II*, 965

F.3d at 896 (noting that it is "well settled" that traditional principles of agency

deference "are applicable to the Attorney General's interpretation of the INA" and its

implementing regulations (internal quotation marks and citation omitted)).  Thus, to the

extent Plaintiffs are challenging Defendants' interpretation of the INA, the Court asks

"whether Congress has directly spoken to the precise question at issue[,]" because

courts "must give effect to the unambiguously expressed intent of Congress."  *Chevron,*

*U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).  But "if the

statute is silent or ambiguous with respect to the specific issue, the question for the

court [becomes] whether the agency's answer is based on a permissible construction of

the statute." *Id.* at 843.  And where Plaintiffs seek to challenge Defendants'

interpretation of *regulations* that implement the INA, the Court asks whether the

regulation is "genuinely" or "truly" ambiguous, "even after a court has resorted to all

the standard tools of interpretation." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019).  If

it is, then the relevant question becomes whether Defendants' interpretation is

"reasonable" or "within the zone of ambiguity the court has identified after employing

all its interpretive tools." *Id.* at 2415–16.

When this Court applies these standards to evaluate the bulk of the provisions of

the Lesson Plan that Plaintiffs point to as examples of the unlawful nature of this

guidance, the Court concludes that USCIS has unlawfully required screening officers to

make credible fear determinations in a manner that is manifestly inconsistent with the

two-stage asylum eligibility framework that the INA plainly establishes.  In addition,

the Court finds that certain Lesson Plan provisions speak to aspects of the credible fear

process that neither Congress nor DHS has expressly addressed, but in so doing USCIS

improperly relies on unreasonable interpretations of the established statutory scheme.

Therefore, the Court concludes that various aspects of the Lesson Plan cannot be

squared with the INA's mandates.

      1.     <ins>The INA And Its Regulations Plainly Establish A Two-Stage
Framework To Demonstrate Asylum Eligibility In The Expedited
Removal Context, And Provide Standards For Making The
Required Assessment At Each Stage Of The Process</ins>

To start, it bears repeating that, under the INA, DHS may designate certain

noncitizens for expedited removal, *see* 8 U.S.C. § 1225(b)(1)(A)(iii)(I)–(II), and the

process for determining whether those individuals will be granted asylum, or will be

removed from the United States swiftly, has two stages: (1) an initial screening to

determine whether or not the noncitizen has a credible fear of persecution or torture in their home country (if she does not, she is slated for expedited removal without an additional hearing), and (2) full removal proceedings, during which the noncitizen bears the burden of establishing her eligibility for asylum.

Moreover, and importantly, the legal standard for whether or not a noncitizen clears the first hurdle in this two-stage process—*i.e.*, whether she is entitled to a positive credible fear determination or an adverse one—is specifically addressed in the INA.  Section 1225(b) defines "credible fear of persecution" as follows:

> For purposes of this subparagraph, the term "credible fear of persecution" means that there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under section 1158 of this title.

*Id.* § 1225(b)(1)(B)(v).  As relevant here, a noncitizen is eligible for asylum under section 1158 if she demonstrates that she "is a refugee[,]" *id.* § 1158(b)(1)(A)—a term that the statute defines as a noncitizen "who is unable or unwilling to return to . . . [her] country because of [past] persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion," *id.* § 1101(a)(42)(A).[14]

---

[14] A "credible fear of torture" is defined by regulation, not statute, and has a meaning that is notably different from the statutory standard that defines a credible fear of persecution.  For example, instead of turning on the "possibility" that the noncitizen "could establish" eligibility in the future, 8 U.S.C. § 1225(b)(1)(B)(v), the regulations that govern credible fear of torture state that "an alien will be found to have a credible fear of torture if the alien shows that there is a significant possibility that he or she *is* eligible for withholding of removal or deferral of removal[,]" 8 C.F.R. § 208.30(e)(3) (emphasis added).  Because the complaint most clearly alleges that provisions of the Lesson Plan concerning the determination of a credible fear of persecution conflict with the INA, the Court has only considered Plaintiffs' claims concerning the Lesson Plan's consistency with the credible fear of persecution

The INA also specifically addresses *the manner* in which government officers undertake to assess whether a noncitizen has a credible fear of persecution.  A trained "asylum officer" interviews the noncitizen, *id.* § 1225(b)(1)(B)(i), and determines whether she has a credible fear of persecution, "taking into account the credibility of the statements" of the applicant in support of her claim and "such other facts as are known to the officer," *id.* § 1225(b)(1)(B)(v).  The applicable regulations clarify that "[t]he purpose of the interview shall be to elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution[,]" and that the interview is to be conducted "in a nonadversarial manner[.]"  8 C.F.R. § 208.30(d).

During this credible fear interview, the noncitizen "may present other evidence" concerning "whether the applicant has a credible fear of persecution or torture[,]" *id.* § 208.30(d)(4); however, such additional proof is only provided "if available[,]" and is not required, *id.*  Accordingly, courts have long held that "the credible fear interview does not require the level of detail expected of the petitioner for an asylum claim[,]" *Yang v. Ashcroft*, 99 F. App'x 124, 125 (9th Cir. 2004), especially since these "often rushed" assessments can occur under "tense conditions," *Lin Ming Feng v. Sessions*, 721 F. App'x 53, 55 (2d Cir. 2018).  As a practical matter, a noncitizen "appearing at a credible fear interview has ordinarily been detained since his or her arrival in the United States and is therefore likely to be more unprepared, more vulnerable, and more wary of government officials than an asylum applicant who appears for an interview before immigration authorities well after arrival."  *Zhang v. Holder*, 585 F.3d 715, 724

---

process laid out in the INA and its implementing regulations.

(2d Cir. 2009).  Moreover, the interviewee "is not represented by counsel, and may be completely unfamiliar with United States immigration laws and the elements necessary to demonstrate eligibility for asylum." *Ramsameachire v. Ashcroft*, 357 F.3d 169, 179 (2d Cir. 2004) (Sotomayor, J.).  Thus, this first stage of the asylum eligibility process is intended to be a mere "screening interview[,]" *Thuraissigiam*, 140 S. Ct. at 1965, during which "[t]he applicant need not show that he or she *is in fact eligible* for asylum—a 'credible fear' equates to only a 'significant possibility' that the alien would be eligible." *Id.* (emphasis in original); *see also Ferreira v. Lynch*, 831 F.3d 803, 809 (7th Cir. 2016) ("[T]he credible-fear interview is not meant to be a detailed account of the events supporting an applicant's asylum claim[.]").[15]

It is also important to note that the noncitizens who are found to have a credible fear of persecution after the credible fear interview are statutorily entitled to proceed to the next stage of the process: section 1225(b)(1)(B)(ii) states unequivocally that, "[i]f the officer determines at the time of the interview that an alien has a credible fear of persecution (within the meaning of clause (v)), the alien *shall be* detained for further consideration of the application for asylum" in the context of full removal proceedings. 8 U.S.C. § 1225(b)(1)(B)(ii) (emphasis added); *see also* 8 C.F.R. § 208.30(e)(5)(i) (providing that a noncitizen who "is able to establish a credible fear of persecution but

---

[15] The relevant legislative history confirms that Congress intended for the credible fear threshold "to be a low screening standard for admission into the usual full asylum process." 142 Cong. Rec. S11,491 (daily ed. Sept. 27, 1996) (statement of Sen. Hatch); *see also* 142 Cong. Rec. H11,081 (daily ed. Sept. 25, 1996) (statement of Rep. Hyde) (explaining that the "significant possibility" standard is lower than the "more probable than not" language used in an earlier version of the bill).  *Cf. Inspection and Expedited Removal of Aliens*, 62 Fed. Reg. 10,312, 10,320 (Mar. 6, 1997) ("The credible fear standard sets a low threshold of proof of potential entitlement to asylum; many aliens who have passed the credible fear standard will not ultimately be granted asylum.").

appears to be subject to one or more of the mandatory bars to applying for, or being granted, asylum . . . shall nonetheless" be placed in full removal proceedings).

With respect to the second stage of the asylum-eligibility process, asylum seekers have a full hearing before an immigration judge, *see* 8 U.S.C. § 1229a, during which they may be represented by counsel, *see id.* § 1362.  The goal, in relevant part, is to "refer[] to specific facts sufficient to demonstrate that the applicant is a refugee[,]" *id.* § 1158(b)(1)(B)(ii), and if the judge "determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence[,]" *id.*  Per the applicable regulations, "[t]he burden of proof is on the applicant for asylum to establish that he or she is a refugee[,]" and the noncitizen "may qualify as a refugee either because he or she has suffered past persecution or because he or she has a well-founded fear of future persecution."  8 C.F.R. § 208.13(a)–(b).

Finally, the INA and its implementing regulations make clear that even those noncitizens who establish that they are *eligible* for asylum because they qualify as refugees are not *entitled* to asylum under U.S. law.  In other words, at the end of the day, asylum is *discretionary* relief that the federal government "*may* grant" to anyone the agency "determines . . . is a refugee" in the context of full removal proceedings. 8 U.S.C. § 1158(b)(1)(A) (emphasis added).  DHS has promulgated regulations that lay out various discretionary criteria to guide agency officials in deciding whether to grant asylum to noncitizens.  In particular, a noncitizen who demonstrates that she has been persecuted *in the past* "shall also be presumed to have a well-founded fear of persecution on the basis of the original claim[,]" 8 C.F.R. § 208.13(b)(1), although an

asylum officer can, "in the exercise of his or her discretion," deny the asylum application of a noncitizen entitled to such a presumption by making a finding, "by a preponderance of the evidence[,]" that either "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution" or "[t]he applicant could avoid future persecution by relocating to another part of the applicant's country of nationality[,]" *id.* § 208.13(b)(1)(i).  If the asylum officer makes either finding, the noncitizen bears the burden of establishing that she "may be granted asylum, in the exercise of the decision-maker's discretion," *id.* § 208.13(b)(1)(iii), for "humanitarian reasons[,]" *Matter of Chen*, 20 I. & N. Dec. 16, 19 (B.I.A. 1989), including "compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution[,]" or when "there is a reasonable possibility that he or she may suffer other serious harm upon removal to that country[,]" 8 C.F.R. § 208.13(b)(1)(iii).

2.  <u>Certain Provisions Of The Lesson Plan Conflate The Initial Credible Fear Screening Standards With The Requirements For Asylum Eligibility, And Are Thus Manifestly Inconsistent With The INA's Express Prescriptions</u>

a.  *The Lesson Plan Requires That A Noncitizen "Identify More Than Significant Evidence That The Applicant Is A Refugee Entitled To Asylum" In Order To Pass The Credible Fear Screening*

The Lesson Plan specifically instructs USCIS asylum officers that "the credible fear significant possibility standard of proof . . . requires the applicant to identify more than significant evidence that the applicant is a refugee entitled to asylum[.]"  (Lesson Plan at 13 (internal quotation marks omitted).)  This policy is in direct conflict with the plain text of the INA and its regulations in three related ways.

First of all, the INA only requires that a credible fear interviewee have a "significant possibility" of establishing her eligibility for asylum, 8 U.S.C. § 1225(b)(1)(B)(v), which is not the same as demanding "more than significant evidence that the applicant is a refugee" (Lesson Plan at 13). These two standards plainly differ, for at least the simple reason that the credible fear screening interview, as Congress envisioned it, focuses primarily on the "statements" of the applicant during the interview, not necessarily any evidence. 8 U.S.C. § 1225(b)(1)(B)(v); *see also* 8 C.F.R. § 208.30(d)(4) (providing that the noncitizen "may present other evidence" only "if available"). By contrast, the Lesson Plan expressly requires the asylum officer to evaluate the applicant's evidence. And the fact that the "significant evidence" language that appears in the Lesson Plan "comes from the D.C. Circuit" in a completely different context (Defs.' Reply at 34) is of no moment. It is entirely inapposite that a D.C. Circuit panel once suggested that one of "the elements of a cause of action for negligent or reckless spoliation of evidence" under D.C. law is "a significant possibility of success of the potential civil action if the evidence were available[,]" and that, in that respect, "'significant possibility' . . . implies a showing higher than the already recognized standard of 'significant evidence.'" *Holmes v. Amerex Rent-A-Car*, 180 F.3d 294, 297 (D.C. Cir. 1999) (quoting *Holmes v. Amerex Rent-A-Car*, 710 A.2d 846, 852, 854 (D.C. 1998)). Thus, Defendants cannot rely on that language or that reasoning to contend that the Lesson Plan's clear shift toward mandating an evidentiary showing at the credible fear stage is consistent with what the INA requires.

Second, and similarly, applicants have a credible fear under the INA if there is a significant possibility that they "*could* establish" that they are refugees during the next

stage of the process, 8 U.S.C. § 1225(b)(1)(B)(v) (emphasis added), which means that the Lesson Plan's requirement that a credible fear interviewee have significant evidence that she "*is* a refugee" unquestionably heightens the bar (Lesson Plan at 13 (emphasis added)).  "Congress' use of a verb tense is significant in construing statutes[,]" *United States v. Wilson*, 503 U.S. 329, 333 (1992), and there is no doubt that the word "is" connotes "a more certain determination" than "could[,]" *Yusupov v. Att'y Gen. of U.S.*, 518 F.3d 185, 201 (3d Cir. 2008) (focusing on a different provision of the INA). Therefore, USCIS's requirement of certainty, as conveyed by the use of the present tense "is," is in tension with Congress's deliberate employment of the verb phrase "could"—for the latter conveys that a possibility, rather than certainty, suffices at the credible fear stage of the asylum-eligibility process.

Third, because even those noncitizens who ultimately manage to establish that they qualify as refugees under the statute are thereby only rendered eligible for asylum, *see* 8 U.S.C. § 1158(b)(1)(A), it is misleading to the point of conflict for the Lesson Plan to require applicants to make a showing of *entitlement* to asylum at the credible fear stage—or, indeed, at any point in the asylum-eligibility process.  (*See* Lesson Plan at 13.)  And to the extent that this part of the Lesson Plan also appears to demand a more substantial showing than what section 1225(b)(1)(B)(v) requires, it unlawfully alters the credible fear standard.  (*See* Pls.' Mot. at 43–44.)

        b.    *The Lesson Plan Imports Factors That Are Relevant For Asylum Relief During The Full Removal Proceeding Stage Into The Initial Credible Fear Determination Process*

Under the INA, a noncitizen "who has suffered past persecution or who has a well-founded fear of being persecuted in the future is eligible for asylum," *Gutierrez-*

*Rogue v. I.N.S.*, 954 F.2d 769, 771 (D.C. Cir. 1992) (internal quotation marks and citation omitted); yet, the ultimate "decision whether to grant asylum is within the discretion of the Attorney General[,]" *id.*  The INA's regulations identify particular grounds for the discretionary denial of asylum to established refugees who suffered persecution in the past, including "a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution" or the ability to "avoid future persecution by relocating to another part of the applicant's country of nationality[.]"  8 C.F.R. § 208.13(b)(1)(i).  This Court agrees with Plaintiffs that, insofar as the Lesson Plan requires asylum officers to consider these kinds of discretionary factors at the credible fear stage of the asylum eligibility process, it plainly subverts the INA's two-stage asylum scheme.

For instance, according to the Lesson Plan, if "internal relocation is reasonable, the applicant does not have a credible fear of persecution."  (Lesson Plan at 16; *see also id.* at 20 (making "a significant possibility that the applicant cannot reasonably internally relocate within his or her country" one of the required elements for a positive credible fear determination).)  The Lesson Plan also specifically instructs USCIS asylum officers that the following findings, taken together, "are sufficient to satisfy the credible fear standard": "(1) there is a significant possibility . . . that the applicant experienced past persecution on account of a protected characteristic, (2) the conditions that gave rise to such persecution continue to exist in the applicant's home country, and (3) the applicant could not avoid such persecution by relocating within his or her home country[.]"  (*Id.* at 19; *see also id.* at 36 (same).)  And the Lesson Plan further indicates

that, "if the evidence does not establish . . . reasons why internal relocation is not possible, a negative credible fear determination is appropriate." (*Id*. at 19.)

These required findings, and the consequences of establishing them as set forth in the Lesson Plan, bear no relationship to the assessments that Congress has prescribed when credible fear determinations are made pursuant to the INA.  Again, all that the statute requires for a determination that the noncitizen has a credible fear of persecution is a significant possibility that the asylum seeker could establish eligibility for asylum, *see* 8 U.S.C. § 1225(b)(1)(B)(v), and once this statutory standard is satisfied, the applicant *must* be deemed to have a credible fear of persecution.  The statute says nothing about country conditions or the ability of the person to relocate.  And the fact that the regulations list such factors as potential bases for the eventual denial of asylum in the discretion of the agency after a full hearing is neither here nor there as far as the initial credible fear screening is concerned; indeed, even when the agency is *required* to deny asylum to certain refugees ultimately, it is clear that asylum officers must *still* allow such persons to proceed beyond the credible fear stage of the process.  *Cf.* 8 C.F.R. § 208.30(e)(5)(i) (indicating that not even mandatory grounds for denial of asylum are sufficient to warrant an adverse determination at the credible fear stage).

This all means that USCIS is not free to add factors that the regulations recognize at other stages of the process to the considerations that an asylum officer must take into account during the credible fear assessment.  Yet, that is precisely what the Lesson Plan does.  (*See, e.g.*, Lesson Plan at 19–20, 25, 36).  And, of course, the mere fact that the Lesson Plan cites to the actual text of the regulations concerning the discretionary factors in the margins of the relevant Lesson Plan pages (*see, e.g.*, Lesson

Plan at 19 (citing 8 C.F.R. § 208.13(b)(1)) does not alleviate the conflict (*see* Defs.'
Mot. at 53 (asserting that the Lesson Plan "direct[s] students to read sections 208 and
235 of the INA, which are codified at 8 U.S.C. §§ 1158 and 1225 and which draw the
contrast between discretionary asylum and the non-discretionary credible fear process"
and suggesting that, as a result, "the Lesson Plan is completely consistent with the
INA")).  If anything, such citations only serve to create confusion, inasmuch as they
underscore the discrepancies between the Lesson Plan's dictates and the statutes and
regulations upon which the agency's training materials are purportedly based.

 The bottom line is this: the Lesson Plan plainly contradicts the unambiguous text
of the INA and its implementing regulations in this significant regard, and nothing in
Defendants' motion or argument demonstrates that the Lesson Plan faithfully describes
what the governing prescriptions establish regarding how USCIS asylum officers are
supposed to identify a noncitizen who has a credible fear of persecution.

   c. *The Lesson Plan Places A Burden On The Asylum Seeker*
    *Who Suffered Past Persecution To Show Unchanged Country*
    *Conditions And The Unavailability Of Internal Relocation*
    *As Prerequisites For A Favorable Credible Fear*
    *Determination*

 The third example in the category of direct contradictions between the
unambiguous text of the INA and the Lesson Plan is straightforward: the Lesson Plan
not only impermissibly requires asylum officers making credible fear assessments to
consider discretionary factors that are applicable only during the full asylum review
process, but also places the burden of making these showings on the asylum seeker.  To
accomplish this, the Lesson Plan states that, unless the noncitizen "establish[es] each
one of the elements below," he or she "must receive a negative credible fear

determination" (Lesson Plan at 20), and one of the listed elements is "Future Fear (Well-Founded Fear)[,]" which the Lesson Plan says requires, among other things, a showing by the noncitizen that is sufficient to "demonstrate[]" either "past persecution based on continuing country conditions" or a "well-founded fear" of persecution (*id.*). Another element that noncitizens must establish to avoid a negative credible fear determination under the Lesson Plan concerns "Internal Relocation" (*id.* at 25); that is, when the noncitizen fears persecution by non-government actors, she bears the burden of demonstrating that there is "a significant possibility that the applicant cannot reasonably internally relocate within his or her country" (*id.* at 25; *see also id.* at 20 ("[I]f the evidence does not establish a significant possibility . . . [that] internal relocation is not possible, a negative credible fear determination is appropriate")).  In this regard, the Lesson Plan specifically requires asylum officers "to assess whether an applicant could relocate to another area of his or her home country in order to avoid the alleged persecution[,]" because, "[i]f such internal relocation is reasonable, the applicant does not have a credible fear of persecution."  (*Id.* at 16.)

    These evidentiary burdens are plainly at odds with the regulations that pertain to credible fear determinations.  (*See* Pls.' Mot. at 42–43.)  For instance, under the regulations, a presumption of asylum eligibility due to past persecution may be rebutted at the full removal hearing stage if *the agency* shows, by a preponderance of the evidence, that the conditions in the country of origin have changed.  *See* 8 C.F.R. § 208.13(b)(1)(i)(A).  But, as explained, in the Lesson Plan, *it is the noncitizen* who must show that those country conditions continue even if her asylum request is based on past persecution, and she must do so at the credible fear stage of the process.  (*See*

Lesson Plan at 20.)  Furthermore, even though the regulations permit agency officials to exercise the discretion to deny asylum when a preponderance of the evidence establishes that an applicant who suffered past persecution might be able to reasonably relocate within her country of origin, *see* 8 C.F.R. § 208.13(b)(1)(i)(B), the Lesson Plan plainly flips that burden onto the shoulders of those credible fear interviewees (*see* Lesson Plan at 16, 25).  Thus, for this reason, too, this aspect of the Lesson Plan conflicts with the INA's implementing regulations.

3.     <u>Certain Provisions Of The Lesson Plan Are Based Upon An Unreasonable Interpretation Of The INA's Asylum Review Process</u>

In addition to those parts of the Lesson Plan that contradict the express requirements of the INA and its implementing regulations concerning what is necessary for noncitizens to be considered to have a credible fear such that they advance to full removal proceedings, as described above, other parts of the Lesson Plan establish unreasonable standards for the credible fear determination with respect to matters that Congress has not specifically addressed, given the thrust of what the INA and its regulations prescribe.  Put in *Chevron* and *Kisor* parlance, the following Lesson Plan provisions can be said to be based on an unreasonable interpretation of the INA, and thereby exceeded the reasonable boundaries of any ambiguity to be found in the statute and related regulations.

> a.     *The Lesson Plan's Mandate That Noncitizens Provide "Evidence" And "Facts" That Pertain To "Every Element" Of Their Asylum Claim Is Plainly Unreasonable Given The Statutory Requirements*

During full removal proceedings, an asylum seeker must offer specific facts that pertain to every element necessary to show that she is a refugee.  *See* 8 U.S.C.

67

§ 1158(b)(1)(B)(i) ("To establish that the applicant is a refugee within the meaning of [section 1101(a)(42)(A) of the INA], the applicant must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant."); *see also Matter of A-B-*, 27 I. & N. Dec. 316, 340 (A.G. 2018), *abrogated on other grounds*, *Grace II*, 965 F.3d 883 (explaining that, during full removal proceedings, an asylum applicant "must present facts that undergird *each* of the[] elements" necessary to establish eligibility for asylum, and the agency "has the duty to determine whether those facts satisfy all of the legal requirements for asylum"). But the INA is silent with respect to the standard of proof that applies when a noncitizen is undergoing an assessment for credible fear of persecution: all that Congress says is that there must be "a significant possibility . . . that the alien could establish eligibility for asylum[.]" 8 U.S.C. § 1225(b)(1)(B)(v).

The Lesson Plan fills this gap by providing that "[t]he applicant bears the burden of proof to establish a credible fear of persecution" by "produc[ing] sufficiently convincing evidence that establishes the facts of the case, and that those facts must satisfy every element of the relevant legal standard[.]" (Lesson Plan at 11.) It further emphasizes that, "[i]n order to establish a credible fear of persecution, the applicant must establish each one of the elements" listed in the Lesson Plan (*id.* at 20), and that "[i]f the applicant is not able to establish all of the elements, the applicant must receive a negative credible fear determination" (*id.*). According to the Lesson Plan, the necessary elements that a noncitizen must establish at the credible fear stage, by offering facts and evidence that go to each element, are: (1) a well-founded fear of persecution, (2) based on either past persecution or a risk of future persecution (3) due

68

to membership in a particular social group, in addition to the discretionary elements for denial of asylum discussed above, such as (4) continuing country conditions and (5) inability to relocate internally.  (*See* Lesson Plan at 21–26.)

The task of determining whether the Lesson Plan's interpretation is a "permissible" or "reasonable" one, *Chevron,* 467 U.S. at 843–44; *Kisor*, 139 S. Ct. at 2416, necessarily requires the Court to focus on the purpose of credible fear interviews as Congress envisioned them, *see Goldstein v. S.E.C.*, 451 F.3d 873, 881 (D.C. Cir. 2006) (explaining that, whether an agency's construction is reasonable depends, in part, "on the construction's fit with the statutory language, as well as its conformity to statutory purposes" (internal quotation marks and citation omitted)); *see also Kisor*, 139 S. Ct. at 2416 (same for regulatory provisions).  As discussed above, it is clear beyond cavil that the credible fear evaluation is intended to be merely an initial screening interview that poses a relatively low bar for asylum applicants, *see Thuraissigiam*, 140 S. Ct. at 1965; *see also Yang*, 99 F. App'x at 125 (explaining that "the credible fear interview does not require the level of detail expected of the petitioner for an asylum claim"); therefore, the required reasonableness analysis need not detain the Court for long.

Again, section 1225's text plainly indicates that an asylum applicant can be found to have a credible fear when the asylum officer concludes that the noncitizen *might* be able to establish the elements of her claim with the assistance of counsel during the subsequent full removal proceeding, even if the noncitizen cannot be said to have established all of those elements at the time of her credible fear interview.  (*See* Pls.' Reply at 29); *see also* 8 U.S.C. § 1225(b)(1)(B)(v).  The INA's implementing

69

regulations also make clear that the credible fear interview is only designed "to elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution," 8 C.F.R. § 208.30(d), and USCIS's Form I-870—which asylum officers use to take notes during credible fear interviews—expressly indicates that "[t]here may be areas of the individual's claim that were not explored or documented for purposes of this threshold screening" (Ex. 11 to Admin. Record, ECF No. 61-10, at 5).

In sum, it is entirely unreasonable for the Lesson Plan to demand that, during the credible fear interview, the noncitizen establish "facts" that "satisfy every element" of her future asylum claim as a prerequisite to getting a favorable credible fear determination.  (Lesson Plan at 11.)  Imposing such a requirement is tantamount to making asylum applicants prove that they *are* a refugee during their credible fear interviews, even though Congress has made abundantly clear that a noncitizen need only carry *that* burden *after* she has shown a credible fear of persecution and has been placed in full removal proceedings.  *See* 8 U.S.C. § 1158(b)(1)(B)(ii).  Put another way, even though the statute and regulations do not speak directly to the standard of proof that is applicable at the credible fear stage of the asylum eligibility process, the one that the Lesson Plan adopts is not based on a reasonable interpretation of those binding statutory and regulatory requirements.

> b.   *The Lesson Plan Unreasonably Permits Asylum Officers To Require Corroboration In The Context Of The Credible Fear Interview Process*

The Lesson Plan erects another impermissible hurdle for noncitizens at the initial stage of the asylum eligibility process, to the extent that it provides that "the asylum officer is . . . entitled to determine that the applicant must provide evidence that

corroborates the applicant's testimony, even where the officer might otherwise find the testimony credible." (Lesson Plan at 12.)  The Lesson Plan states that, "[i]n cases in which the asylum officer determines that the applicant must provide such evidence, the asylum officer must provide the applicant notice and the opportunity to submit evidence, and the applicant *must* provide the evidence unless the applicant cannot reasonably obtain the evidence." (*Id.* (emphasis in the original).)  To be sure, at the point in which the Lesson Plan provides this authority for asylum officers to mandate corroboration, it cites the general statutory and regulatory provisions that apply to credible fear determinations. (*See id.* (citing 8 U.S.C. § 1225(b)(1)(B)(v); 8 C.F.R. § 208.30(e)(2)).)  But nothing about eliciting corroborating evidence appears in those provisions.  And, in fact, USCIS seems to have imported the corroboration standards from the statutory provision that addresses full asylum proceedings, *see* 8 U.S.C. § 1158(b)(1)(B)(ii), and adopted those standards nearly verbatim with respect to the Lesson Plan's instructions for making a credible fear determination.

Thus, once again, the question for this Court is whether it is reasonable for the agency to employ a standard that applies to full asylum proceedings—*i.e.*, the authority to request corroboration—in the context of the credible fear process, given the INA's purposes and in light of relevant statutory and regulatory language. *See Chevron,* 467 U.S. at 843–44; *Kisor*, 139 S. Ct. at 2416.  And for the reasons that follow, given both "the goals of the statute[,]" *Vill. of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 660 (D.C. Cir. 2011) (internal quotation marks and citation omitted), and the "statutory purposes[,]" *Abbott Labs. v. Young*, 920 F.2d 984, 988 (D.C. Cir. 1990), the

Court cannot discern a reasonable fit between the Lesson Plan's corroboration requirement and the credible fear process that Congress created.

The legislative history of the credible fear provision provides one lens through which to view Congress' intent with respect to a noncitizen's burden during the credible fear stage of the asylum application process.  An early draft of the 1996 amendments to the INA provided that, "in order to establish a credible fear of persecution, the applicant for asylum would need to establish that 'it is more probable than not that the statements made by the alien in support of the alien's claim are true, and . . . there is a significant possibility, in light of such statements . . . that the alien could establish eligibility for asylum.'"  H. Rep. No. 104-469, at 529 (Mar. 4, 1996).  However, certain members of the House of Representatives and the Senate believed that that was "simply too onerous a standard for an asylee to meet who has just escaped dangerous persecution."  *Id.*  And, ultimately, Congress "struck a compromise by rejecting the higher standard of credibility included in the House bill" and adopting the enacted credible fear provision, which was "intended to be a low screening standard for admission into the usual full asylum process."  142 Cong. Rec. S11,491 (daily ed. Sept. 27, 1996) (statement of Sen. Hatch).

It is certainly true that "credible fear interviewees are [reasonably] asked to provide all of the *reasons* for their concern about being removed," *Zhang,* 585 F.3d at 724 (emphasis in original), but "they are not required to give a detailed and specific account of the bases for their claims, as applicants for asylum must in their asylum application[,]" *id.* (internal quotation marks and citation omitted).  Thus, the Lesson Plan's instruction that an asylum officer might require the interviewee to "provide

72

evidence that corroborates the applicant's testimony, *even where the officer might otherwise find the testimony credible*" (Lesson Plan at 12 (emphasis added))—*i.e.*, even when "the credibility of the statements made by the alien in support of the alien's claim" is not in question, 8 U.S.C. § 1225(b)(1)(B)(v)—clearly transforms the credible fear interview, which is a mere screening process that is primarily focused on assessing the noncitizen's credibility as a means of determining whether she could ultimately and eventually establish refugee status, into a probing quest for evidence that is virtually indistinguishable from full asylum eligibility proceedings.

Consequently, this Court has little doubt that the Lesson Plan's authorization of demands for corroboration at the credible fear stage rests on an unreasonable interpretation of what the INA and its implementing regulations allow. (*See* Pls.' Mot. at 46–47.)

        c.     *The Lesson Plan Unreasonably Requires The Screening Officer To Consider Whether The Noncitizen's Home Government Has "Abdicated Its Responsibility" To Control Persecution*

The Lesson Plan's effort to assist asylum officers with the core task of identifying when a noncitizen has a credible fear of persecution by defining the term "persecution"—which the INA does not specifically address—is impermissible for substantially similar reasons. At least ever since *Matter of Acosta*, 19 I. & N. Dec. 211 (B.I.A. 1985), the term "persecution" as it appears in the INA has been understood to refer to "harm or suffering . . . inflicted either by the government of a country or by persons or an organization that the government was unable or unwilling to control[,]" *id.* at 222; *see also generally Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1062–69 (9th Cir. 2017) (collecting cases applying the "unable or unwilling" standard). In

*Grace II*, the D.C. Circuit set aside the agency's attempts to recharacterize the "unable or unwilling" standard as referring solely to circumstances in which the noncitizen's home country has "condoned the behavior or demonstrated a complete helplessness to protect the victim." *Grace II*, 965 F.3d at 897 (internal quotation marks and citation omitted).[16]  But USCIS continues in this impermissible vein with the language that it has adopted in the Lesson Plan:  it explains that, "[f]or a credible fear of persecution, there must be a significant possibility the applicant can establish that the entity that harmed the applicant (the persecutor) is . . . an entity that the government is unable or unwilling to control[,]" but because "[a]sylum officers must recognize that no government can guarantee the safety of each of its citizens or control all potential persecutors at all times[,]" "[i]t is not sufficient for an applicant to assert that the government lacks sufficient resources to address criminal activity[;] [r]ather, the government must have *abdicated its responsibility to control persecution*."  (Lesson Plan at 23–24 (emphasis added).)

This Court finds that the Lesson Plan's guidance is a departure from prior agency regulations and adjudications, and one that is not owed deference under *Kisor*, for largely the same reasons that D.C. Circuit expressed in *Grace II*.  Specifically, a government need not entirely abdicate its protection duties in order to be *unable* to control persecution by third parties.  (*See* Pls.' Mot. at 47 (arguing that the Lesson Plan

---

[16] According to the D.C. Circuit, those two "formulations" of the standard for persecution are "hardly interchangeable" for at least two reasons: first, "[a] government that 'condones' or is 'completely helpless' in the face of persecution is obviously more culpable, or more incompetent, than one that is simply 'unwilling or unable' to protect its citizens[,]" *Grace II*, 965 F.3d at 898–99; and, second, when applied to the same set of facts, the two formulations may lead to opposite outcomes, *see id.* at 899 (discussing *Rosales Justo v. Sessions*, 895 F.3d 154, 159 (1st Cir. 2018)).

improperly "conflates the two prongs of the relevant standard—that the government be

'unable *or* unwilling to control' the persecutor").)  Moreover, that distinction is

important, because the Lesson Plan's reformulation might well lead asylum officers to

make an adverse credible fear determination in cases where it would be appropriate to

find that the noncitizen does have a credible fear of persecution using the BIA's unable-

or-unwilling standard.

      To understand why this is so, consider the example that the D.C. Circuit

contemplated in *Grace II*:  where a person seeks asylum after the murder of their child

due to the devastating impact of organized crime in their home community, the fact that

the local authorities "responded to the crime scene, took statements from the asylum

seeker and his wife, and autopsied the body[,]" *Grace II*, 965 F.3d at 899, indicates that

the government had not necessarily "abdicated its responsibility to control persecution"

(Lesson Plan at 24); however, if there is evidence that "organized criminals generally

operated with impunity" in the community nonetheless, the government can rightly be

said to be *unable* to offer its citizens protection, *Grace II*, 965 F.3d at 899.

Consequently, USCIS cannot reasonably instruct its officers that the hallmark of

"unwilling or unable" is that the government has abdicated its responsibility to protect

its citizens without running afoul of its prior pronouncement that a credible fear of

persecution can be established based on the government's inability to afford adequate

protection.  *Cf. Kisor*, 139 S. Ct. at 2417–18.

      Defendants' arguments to the contrary are not persuasive.  Defendants maintain

that, "when read in context and with the deference it is due," the Lesson Plan does not

unlawfully *change* the unable-or-unwilling standard; its "discussion of a government

abdicating its responsibility to control a persecutor is simply *explanatory*, provided as a counterpoint to the explanation that it is not enough to merely show that the government lacks resources[.]"  (Defs.' Reply at 37 (emphasis added).)  But, of course, an explanation that does not faithfully adhere to the statutory or regulatory standard that it purports to explicate is owed no deference.  *See Circus Circus Casinos, Inc. v. N.L.R.B.*, 961 F.3d 469, 483 (D.C. Cir. 2020) ("Courts do not defer to an agency's arbitrary and capricious interpretation of its own standard.").  And, here, as in *Grace II*, the agency's explanation portends a situation in which asylum officers "can choose between the two standards"—"unwilling or unable" versus abdication of the duty to protect—such that a noncitizen "appearing before one official may suffer deportation" while an "identically situated" noncitizen "appearing before another may gain the right to stay in this country."  *Grace II*, 965 F.3d at 900 (internal quotation marks, alteration, and citation omitted).

Thus, this Court finds the Lesson Plan's effort to illuminate the meaning of "persecution" is not based on a reasonable interpretation of the "unable or unwilling" standard that the agency had previously announced in its adjudications interpreting that term, and is therefore impermissible.

**D.    The Unlawful Provisions Of The Lesson Plan Cannot Be Severed From The Remainder Of The Document, So The Court Will Exercise Its Equitable Authority To Vacate The Entire Lesson Plan And Will Also Order New Credible Fear Determinations For These Plaintiffs**

Based on the prior discussion, the Court has concluded that certain parts of USCIS's "Lesson Plan on Credible Fear of Persecution and Torture Determinations" conflict with the INA and its implementing regulations in various ways, as Plaintiffs

allege in their complaint.  (*See* Section IV.C., *supra*.)[17]  Accordingly, Plaintiffs are

entitled to summary judgment with respect to the first claim for relief in their

complaint, given the Court's conclusion that certain parts of the Lesson Plan

impermissibly conflict with the INA and its implementing regulations as a matter of

law.  (*See* Am. Compl. ¶¶ 90, 92–93.)  Plaintiffs have presented the remaining claims

for relief—including their contention that the Lesson Plan violates the notice-and-

comment provisions of the APA—in the "alternative" (Pls.' Mot. at 39); therefore, the

Court need not proceed to evaluate Plaintiffs' APA and constitutional claims at this

juncture.  Instead, the question now becomes what remedy is appropriately afforded to

these Plaintiffs based upon their success in establishing their entitlement to relief with

respect to their first claim.

In this regard, Defendants insist that, per the terms of section 1252(e)(3), the

Court can only issue a declaratory judgment—*i.e.*, the Court "may only determine the

---

[17] The Court is not convinced that the other provisions of the Lesson Plan that are highlighted in
Plaintiffs' complaint constitute similarly unlawful agency action.  Specifically, the complaint alleges
that the Lesson Plan conflicts with the INA and its regulations in three additional respects.  Plaintiffs
maintain that the Lesson Plan impermissibly (1) instructs that the asylum seeker must establish greater
than "a 1 in 10 chance of future persecution" (*see* Am. Compl. ¶ 82(b)); (2) requires asylum officers "to
measure the asylum seeker's statements against information in Department of State-issued reports . . .
and to treat the reports as 'objective' fact" (*see* ¶ 84(a)); and (3) suggests that asylum officers "need
not provide the asylum seeker with an opportunity to address concerns that might lead to a negative
credibility determination" (*see* ¶ 84(b)).  In this Court's view, none of these provisions constitutes an
irreconcilable conflict between the Lesson Plan and the applicable statutory and regulatory provisions.
The Lesson Plan plainly clarifies that the Supreme Court's discussion of a one-in-ten chance of
persecution in *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 431–32 (1987), was dicta.  (*See* Lesson Plan at
21–22.)  The applicable regulations permit asylum officers to rely on "material provided by the
Department of State[,]" *see* 8 C.F.R. § 208.12(a), and the Lesson Plan's requirement that officers
consult such material does not conflict with that authorization.  Nor does the Lesson Plan's directive
that asylum officers "*should* follow up" on credibility concerns and "*should* give the applicant and
opportunity to explain all concerns" (Lesson Plan at 16 (emphasis added)) suggest that officers need
not do so in a manner that contradicts or undermines the asylum officers' obligation to elicit all
relevant and useful information, as required under the applicable regulations, *see* 8 C.F.R. § 208.30(d),
and as clearly stated in the Lesson Plan (*see* Lesson Plan at 11).

Lesson Plan's lawfulness, and lacks statutory authority to enjoin or vacate the Lesson Plan or stay removals." (Defs.' Mot. at 63.) The Court rejects this unfounded contention for the reasons explained below. To the contrary, it is well settled that federal courts have equitable power to order the vacatur of unlawful agency conduct— in whole or in part—and nothing in the INA restricts or withdraws that established authority. Furthermore, in the instant case, it is appropriate for the Court to vacate the Lesson Plan in its entirety, because the unlawful provisions are not severable from the rest of the document. In addition, to ensure that Plaintiffs are made whole, the Court has determined that a limited injunction that requires USCIS to void Plaintiff's credible fear determinations, and provide new ones as necessary to evaluate their entitlement to press their asylum claims in full removal proceedings, is warranted.

1.      Vacatur Is An Appropriate Remedy Under These Circumstances

It is blackletter law that vacatur is "a form of equitable relief that the Court may award, withhold, and craft to fit the circumstances of the case before it." *Sierra Forest Legacy v. Sherman*, 951 F. Supp. 2d 1100, 1106 (E.D. Cal. 2013); *see also* 73A C.J.S. *Public Administrative Law and Procedure* § 552 (Sept. 2020) (explaining that "vacatur is a species of equitable relief"). Indeed, according to the D.C. Circuit, when a reviewing court declares that the challenged action of an administrative agency violates the law, vacatur is the "normal remedy," *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014), and the "ordinary result" that follows from the court's determination, *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998). In essence, a vacatur order takes the unlawful agency action "off the books[,]" *AFL-CIO v. Chao*, 496 F. Supp. 2d 76, 92 (D.D.C. 2007), which is an entirely

appropriate response when a plaintiff successfully establishes that the agency's conduct violates the law, *see, e.g.*, *Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety and Health Admin.*, 920 F.2d 960, 966–67 (D.C. Cir. 1990).

It is notable that federal courts have equitable power to order vacatur even in the absence of a specific statutory authorization.  *See* 73A C.J.S. *Public Administrative Law and Procedure* § 552 (Sept. 2020); *see also Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 70–71 (1992) ("The general rule . . . is that absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute.").  But the appropriateness of such relief is further underscored by the fact that Congress has specifically prescribed this particular remedy when agency action violates the law and the plaintiff brings her claim under the APA.  *See* 5 U.S.C. § 706(2) (stating that, under the specified circumstances, a "reviewing court shall . . . hold unlawful and set aside agency action").

Nothing in the INA divests the federal courts of their traditional power to vacate unlawful agency action.  (*But see* Defs.' Mot. at 62–67.)  In support of the argument that this Court cannot vacate the Lesson Plan, Defendants first point to section 1252(e)(1)(A), which provides that "no court may enter declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) of this title except as specifically authorized in a subsequent paragraph of this subsection[.]"  8 U.S.C. § 1252(e)(1)(A).  The agency reads this provision to strip federal courts of *all* such equitable remedies in *all* circumstances.  (*See* Defs.' Mot. at 63.)  But as the D.C. Circuit recently explained, section

79

1252(e)(1)(A) is inapplicable to "challenges on the validity of the expedited-removal system"—like the one at issue here—given that such challenges are "authorized in a subsequent paragraph" of the INA, namely section 1252(e)(3). *Grace II*, 965 F.3d at 907 (internal quotation marks, citations, and alterations omitted). In addition, Congress must have meant for section 1252(e)(1)(A)'s restrictions to apply only when a court is called upon to examine "underlying credible-fear determinations[,]" *id.*; otherwise, it would have "expressly authorized the district court to review expedited-removal policies yet simultaneously prohibited it from issuing any remedies[,]" *id*.

Defendants' second statutory argument (*see* Defs.' Mot. at 66) is similarly unpersuasive. The agency observes that section 1252(e)(3)(A) authorizes the United States District Court for the District of Columbia to make a "determination[]" regarding whether certain regulations and written policies are valid, *see* 8 U.S.C. § 1252(e)(3)(A), and because a "determination" can theoretically be conceived of as a form of declaratory relief, Defendants surmise that the sole "specifically authorized remedy" in the relevant subsequent paragraph, as per section 1252(e)(1)(A), is a declaration that the agency's written policy is unlawful. (*See* Defs.' Mot. at 66.) Of course, this interpretation ignores the fact that section 1252(e)(3) is not addressed to remedies. Moreover, the clear context of that provision's reference to "determinations" is that Congress is authorizing the United States District Court for the District of Columbia to undertake judicial review of the implementation of the expedited removal scheme, but further specifying that such review "shall be limited to determinations of" *certain legal issues*, including whether the written policy directive, guideline, or procedure is consistent with the INA. 8 U.S.C § 1252(e)(3)(A)(ii). Establishing that this Court is

authorized to determine specified legal issues cannot be logically equated with the remedies that the Court may prescribe once such a determination has been made. *See Grace II*, 965 F.3d at 907 ("'Determination' . . . denotes a decision, not a remedy.") What is more, the D.C. Circuit considered and rejected Defendants' declaration-only interpretation in *Grace II*, when it upheld in part an injunction that the district court had issued as a remedy for a legal determination that the district judge made pursuant to section 1252(e)(3). *See id.* at 908–09.

Still, Defendants argue that, even if the INA itself does not place limits on this Court's remedial powers, a vacatur is not appropriate in this case as a matter of the equities.  (*See* Defs.' Mot. at 65 (citing *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993).)  To be sure, courts "have commonly remanded without vacating an agency's rule or order where the failure lay in lack of reasoned decisionmaking, [and] also where the order was otherwise arbitrary and capricious[.]"  *Int'l Union*, 920 F.2d at 966; *see also Allied-Signal*, 988 F.2d at 150 (remanding without vacating where the agency action is "inadequately supported").  But where the agency action is "so crippled as to be unlawful[,]" and not simply "potentially lawful but insufficiently or inappropriately explained[,]" it is clear beyond cavil that the common "practice is to vacate the agency's order[.]"  *Radio-Television News Directors Ass'n v. F.C.C.*, 184 F.3d 872, 888 (D.C. Cir. 1999).  Thus, Defendants cannot reasonably dispute that vacatur is the norm where, as here, the deficiencies that the court has identified are "substantively fatal[.]"  *Int'l Union*, 920 F.2d at 967.

Defendants' other remedy-related contention (*see* Defs.' Mot. at 63) is also baseless.  They insist that, absent a class action—which Congress has expressly

prohibited in this context, *see* 8 U.S.C. § 1252(e)(1)(B)—"the Court has no authority to vacate or enter an injunction against the Lesson Plan," but may only "order limited systemic relief at the behest of individual aliens."  (Defs.' Mot. at 63.)  (*See also* Defs.' Grace Brief at 12 ("[I]n no event, and for no claims, should any relief extend beyond the five Plaintiffs here[.]").)  With this argument, Defendants have cast a standard order that is directed solely to the agency that is before the court and that vacates a particular policy directive that Plaintiffs have successfully challenged (without purporting to create enforcement rights with respect to anyone other than Plaintiffs) as a "prospective nationwide injunction" that inappropriately "reaches the future credible fear determinations of hundreds of thousands of aliens 'none of whom are parties to the lawsuit,' and 'unconstrained by the requirements' of Rule 23."  (Defs.' Mot. at 65.)  Unfortunately for Defendants, this Court has seen this play before.  *See, e.g., MTRNY I*, 405 F. Supp. 3d at 71 (rejecting similar contentions), *rev'd on other grounds*, *MTRNY II*, 962 F.3d 612.  And in the end, contrary to Defendants' representations, it is the "long-held understanding that once a rule is vacated, it is vacated for everyone." *D.A.M. v. Barr*, No. 20-cv-1321, 2020 WL 5525056, at *7 (D.D.C. Sept. 15, 2020).

It suffices to note here that the argument that a court can only vacate the agency's unlawful conduct with respect to the particular plaintiffs who have filed the legal action that is before it has no grounding in the Article III doctrine or in any federal statute of which this Court is aware.  This argument also conveniently ignores the fact that what is at issue in the lawsuit is the agency's unlawful conduct—here, its issuance of a binding instruction manual that contains provisions that conflict with the INA—and *that conduct, when it was undertaken, was not directed at the Plaintiffs in*

*this lawsuit*.  Thus, where the legal claim at issue is the unlawfulness of an agency action of general applicability, it makes no sense whatsoever to insist that a district court limit its vacatur to address solely the impact of the unlawful agency action on the plaintiffs.  In fact, doing so is tantamount to transforming a facial challenge to agency conduct into an as applied claim.  It defies both law and logic.

It is also worth observing that no less an authority than the Supreme Court has made it abundantly clear that injunctions and vacaturs are distinct remedies, and that the latter is considered substantially less intrusive.  *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010) (explaining that injunctive relief is "a drastic and extraordinary remedy, which should not be granted as a matter of course[,]" whereas a "partial or complete vacatur" of an agency's action is a different, "less drastic remedy" that, at times, might be "sufficient to redress" a plaintiff's injury); *see also Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1916 n.7 (2020) (recognizing this distinction by holding that affirmance of the "order vacating the [agency action] makes it unnecessary to examine the propriety of the nationwide scope of the injunctions").  And given the established and lengthy history of federal courts employing their equitable powers to vacate unlawful agency actions, Defendants' professed concern that a vacatur would "reach[] the future credible fear determinations of hundreds of thousands of aliens none of whom are parties to the lawsuit" (Defs.' Mot. at 65 (internal quotation marks and citation omitted)) is really neither here nor there when it comes to demonstrating that this Court lacks the authority to issue a vacatur order in this case.  That is to say, the mere fact that a vacatur order may *happen* to confer a possible benefit upon other individuals who are not before the Court—

indeed, conceivably, any and every person who might have otherwise been subjected to the government's unlawful conduct benefits from its vacatur—is not a *reason* to conclude that the Court lacks the power to nullify the unlawful government practice; indeed, that collateral consequence is wholly irrelevant to the determination of whether or not a standard vacatur order is appropriate to remedy the violation of law that the court has pronounced. Regardless, if a court concludes that an agency action violates the law, vacatur is routinely ordered to address that substantively unlawful conduct, notwithstanding the alleged windfall that the nullification gives to nonparties (if being shielded from violative agency action can even rationally be considered as such).

The Court notes further that this typical result has rarely been an issue, because an administrative agency that is acting in good faith and in the public's interest can be expected to heed the implications of the federal court's ruling and desist voluntarily from engaging in conduct that the court has deemed unlawful (at least pending its appeal of the court's determination) in any event. *See Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1565 (D.C. Cir. 1984) (en banc) (Scalia, J., dissenting) (explaining that "it must be assumed that officers of the Executive Branch will honor their oath to uphold the laws of the United States[,]" and therefore "once a court takes it upon itself to pronounce that the actions challenged here are unlawful all of the adverse effects of injunction . . . ensue"); *see also Alsea Valley All. v. Dep't of Commerce*, 358 F.3d 1181, 1186 (9th Cir. 2004) (explaining that a vacatur "prohibits, as a practical matter, the enforcement" of an unlawful agency action, but is not actually "the practical equivalent of 'enjoining'" the agency, and noting that such reasoning, "[t]aken to its logical end," would "classify as 'injunctive' all declaratory relief that deems an agency

rule unlawful").  It has apparently only been in recent years that federal agencies have consistently and audaciously demanded an entitlement to persist in the unlawful conduct despite a federal court's ruling declaring that conduct unlawful, which has manifested itself in the strange argument that Defendants have presented here—*i.e.*, that *precisely because* outsiders might benefit from a vacatur, the Court lacks the power to vacate the agency action and must instead craft a remedy that permits the agency to continue to act in flagrant violation of the law as the court has announced it to be with respect to anyone who has not been joined as a party in the case before the court.[18]

Yet, here as elsewhere, Defendants have failed to provide any persuasive reason *why* the potential incidental benefit that is conferred to the rest of humanity when a court addresses unlawful agency action by vacating the agency's conduct is sufficiently problematic, under the Constitution or otherwise, to justify limiting a federal court's traditional power to nullify the actions of the defendant when that challenged conduct violates the law.  *See L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 37 (D.D.C. 2020) (explaining that the "consequences" of a vacatur "with respect to parties not before the Court" simply "lie[] beyond this Court's jurisdiction").  And there is none, in light of "[t]raditional administrative law principles[,]" which dictate that, "[w]hen a reviewing

---

[18] As other district court judges have ably noted, "[f]or the [government] to suggest that they were entitled . . . to basically ignore [a court's] declaratory judgment until after appellate review is exhausted is unsupported in the law." *Florida ex rel. Bondi v. Dep't of Health & Human Servs.*, 780 F. Supp. 2d 1307, 1316 (N.D. Fla. 2011) (internal quotation marks omitted).  Moreover, as a practical matter, "[t]he Court does not know how a court vacates a rule only as to one state, one district, or one party[,]" *N.M. Health Connections v. Dep't of Health Human Servs.*, 340 F. Supp. 3d 1112, 1183 (D.N.M. 2018), or what "it [would] mean to 'vacate' a rule as to some but not other members of the public[,]" *O.A.*, 404 F. Supp. 3d at 153.  Nevertheless, federal agencies appear to be making a concerted effort to conscript the courts in this tedious self-censoring exercise on the seemingly irrelevant grounds that non-parties may be tangentially affected if the court exercises its ordinary equitable powers.  *See, e.g., MTRNY I*, 405 F. Supp. 3d at 71.

court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *see also Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2351 n.8 (2020) (explaining that, when "a provision [of law] is declared invalid[,]" the invalid provision "cannot be lawfully enforced against others"—and not just "against the plaintiff"); *Grace v. Whitaker*, No. 18-cv-1853, 2019 WL 329572, at *2 (D.D.C. Jan. 25, 2019) ("There is no statutory requirement, as the government argues, to declare a policy in violation of the law only as applied to the individual plaintiffs."). In addition, Defendants' limited vacatur argument flies in the fact of the "fundamental" notion that "agency policy is to be made, in the first instance, by the agency itself [and] not by courts[,]" *Harmon*, 878 F.2d at 494, since vacating or enjoining a rule of general applicability only with respect to specific parties "would be drawing a line which the agency itself has never drawn[,]" *id*. at 495.

Therefore, in addition to declaring that certain provisions of the Lesson Plan are unlawful, this Court will proceed to vacate all or part of the Lesson Plan, as in the ordinary course, to ensure that USCIS implements the Court's determination with respect to the agency's unlawful action. *Cf. A.B.-B.*, 2020 WL 5107548, at *9 (declaring that DHS's policy to allow CBP officers to conduct credible fear interviews instead of USCIS asylum officers violated the INA, and issuing a preliminary injunction under section 1252(e)(3) that prohibits DHS from implementing its policy of authorizing CBP officers to conduct credible fear screenings).

2.      The Unlawful Provisions Of The Lesson Plan Are Not Severable
        From The Remainder Of The Document, Such That Vacatur Of The
        Entire Lesson Plan Is Required

The next question that must be answered is whether the Court needs to vacate the
*entire* Lesson Plan, or whether the various unlawful provisions that Plaintiffs have
successfully identified can be severed from the rest of the document.  This Court
ordered the parties to provide supplemental briefing on this issue (*see* Pls.' Suppl. Brief
on Severability, ECF No. 68; Defs.' Suppl. Brief on Severability, ECF No. 69), and
after a careful review of both the parties' arguments and the governing legal standards,
the Court has concluded that the unlawful parts of the Lesson Plan described in Section
IV.C above cannot, and should not, be severed by the Court.

"Whether an administrative agency's order or regulation is severable, permitting
a court to affirm it in part and reverse it in part, depends on the issuing agency's
intent."  *North Carolina v. F.E.R.C.*, 730 F.2d 790, 795–96 (D.C. Cir. 1984).  The
necessary intent is ordinarily ascertained pursuant to a two-prong test: (1) whether "the
agency would have adopted the same disposition regarding the unchallenged portion of
the regulation if the challenged portion were subtracted[,]" and (2) whether the parts of
the regulation that remain can "function sensibly without the stricken provision[,]"
*Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019) (internal
quotation marks, citations, and alternation omitted).  With respect to the first prong,
severance "is improper if there is 'substantial doubt' that the agency would have
adopted the severed portion on its own."  *Davis Cnty. Solid Waste Mgmt. v. E.P.A.*, 108
F.3d 1454, 1459 (D.C. Cir. 1997) (per curiam) (internal citation omitted).  With respect
to the second factor, the Court asks whether severance "would severely distort the

[agency's] program and produce a rule strikingly different from any the [agency] has ever considered or promulgated[.]" *MD/DC/DE Broadcasters Ass'n v. F.C.C. ("MD/DC/DE I")*, 236 F.3d 13, 23 (D.C. Cir. 2001).

Application of this standard severability analysis to the facts of the instant case compels the conclusion that the unlawful portions of the Lesson Plan that the Court discusses above are not severable for at least three reasons. First, the Lesson Plan's stated purpose is "to explain how to determine whether an alien subject to expedited removal or an arriving stowaway has a credible fear of persecution or torture" (Lesson Plan at 2), and the unlawful provisions that this Court has addressed speak directly to critical aspects of the credible fear assessment, such that the Court has "substantial doubt" that Defendants would have adopted a guidance document that excluded the directives concerning the credible fear determination that this Court has found to be unlawful. *North Carolina*, 730 F.2d at 796. Second, it is also hard to imagine how the Lesson Plan "could function sensibly as a freestanding" guidance document without the unlawful provisions. *MD/DC/DE Broadcasters Ass'n v. F.C.C. ("MD/DC/DE II")*, 253 F.3d 732, 735 (D.C. Cir. 2001). The various directives are so interwoven that it is highly likely that severance would "severely distort" the binding instructions that the agency has issued concerning how to administer the complex system of credible fear determinations, resulting in a policy document that is "strikingly different" from prior versions of the Lesson Plan. *MD/DC/DE I*, 236 F.3d at 23. Third, and even more to the point, setting aside the post-hoc representations that Defendants have made in the severance brief that the Court required them to file during the course of this litigation (*see, e.g.*, Defs.' Suppl. Brief on Severability at 11), USCIS has not made any statement

or given any other indication that it ever intended any of the Lesson Plan's provisions to function independently of the rest, *see Sierra Club v. F.E.R.C.*, 867 F.3d 1357, 1366 (D.C. Cir. 2017).  *Cf. AFL-CIO v. N.L.R.B.*, No. 20-cv-0675, 2020 WL 3041384, at *19 (D.D.C. June 7, 2020) (observing that, by stating that it "would adopt each of these amendments individually, or in any combination, regardless of whether any of the other amendments were made[,]" the agency had specifically addressed severability in the challenged rule (internal citation omitted)).

Undaunted, Defendants assert that "[t]here is no doubt that USCIS would have issued the Lesson Plan" *without* the challenged provisions, because "USCIS has repeatedly revised its Lesson Plan" over the years, and "the vast majority of the Lesson Plan under review in this case . . . has been included in several past iterations of the Lesson Plan."  (Defs.' Suppl. Brief on Severability at 11.)  But this argument cuts *against* the agency's severability position instead of bolstering it.  For one thing, it appears that USCIS issues an entirely new Lesson Plan when there is an update, instead of maintaining previous portions and repealing only certain segments as circumstances change.  (*See, e.g.,* Defs.' Status Report, ECF No. 58, at 1 (explaining that "the primary effect of the September 2019 Lesson Plan[,]" which replaced the April 2019 Lesson Plan, "is to incorporate a discussion of a new immigration administrative decision, *Matter of L-E-A-*, 27 I. & N. Dec. 581 (A.G. 2019)")).)  This editorial prerogative indicates the connectedness of the document's directives and the agency's apparent view that particular provisions of this manual are not wholly independent of the rest. *Cf., e.g.*, *Am. Petroleum Inst. v. E.P.A.*, 862 F.3d 50, 71–72 (D.C. Cir. 2017) (explaining that the court could not find that two provisions were "wholly independent"

89

because "[a]t no point in the record does EPA propose keeping [one provision] and repealing [the other]").  It is also clear from the redlined version of the Lesson Plan that Plaintiffs have filed to indicate the changes that the agency made to produce the April 2019 version (*see* Ex. A to Pls.' Mot., ECF No. 36-3, at 4–72) that the challenged portions are not *isolated* in the least; they involve hundreds of line strikes and additions, which manifests the author's intent to integrate these edits into the training materials in a manner that is comprehensive and wholesale.[19]

That said, this Court acknowledges the validity of Defendants' concern that "completely vacating the Lesson Plan" with immediate effect "would leave USCIS without an up-to-date training document reflecting the latest legal developments, and instead force the agency to teach officers on materials that no longer reflect the law[.]" (Defs.' Suppl. Brief on Severability at 16.)  Of course, this Court has ruled that the current version of the training manual does not accurately reflect the law, and the inability to rely on an unlawful policy document is the ordinary impact of the vacatur of such agency action.  Also, after more than a year of litigation over the particular provisions of the Lesson Plan that are specifically identified in Plaintiffs' complaint, Defendants cannot reasonably complain that the Court's ruling catches them off guard.

---

[19] In support of their cross-motion for summary judgment, Plaintiffs have submitted additional evidence and declarations, outside of the administrative record, including the redlined version of the Lesson Plan.  (*See generally* Exs. A–Q to Pls.' Mot., ECF No. 36-3.)  Defendants have moved to strike these documents because, "[u]nder the APA, the district court's review of merits issues must be based on the record the agency presents to the reviewing court."  (Defs.' Mem. in Supp. of Mot. to Strike Evidence Outside of Admin. Record, ECF No. 52-1, at 3 (internal quotation marks and citation omitted).)  Defendants' argument is inapposite where, as here, the Court is evaluating the remedies for non-APA related claims, and Defendants make no argument as to why it would be inappropriate for the Court to rely on such evidence with respect to these INA claims.  Accordingly, Defendants' motion to strike evidence outside of the administrative record will be **DENIED**.

The Court also finds it odd that USCIS argues *both* that a vacatur order would be substantially disruptive because it would create "a vacuum on guidance for any new developments in immigration law since 2017" (*id.* at 8), *and* that the provisions that the Court has found unlawful are discrete and severable, because the April 2019 version "has been included in several past iterations of the Lesson Plan" (*id.* at 11).  The former merely underscores the non-severability finding that the agency contests.  And, if the latter is the case, then responding to the vacatur should not be particularly onerous, for the agency can rely on the allegedly substantially similar 2017 version of the Lesson Plan while it fashions relevant updates that are consistent with the law.

Nor is this a case in which vacating the entire Lesson Plan would necessarily create confusion, *see Chamber of Commerce v. S.E.C.*, 443 F.3d 890, 909 (D.C. Cir. 2006) (staying a vacatur order on this ground), or deprive one or more parties of significant rights, *see Bauer v. DeVos*, 332 F. Supp. 3d 181, 185 (D.D.C. 2018).  The instant detailed opinion explains why various provisions of the Lesson Plan violate the INA, and thus should be sufficient to guide the agency's reconsideration and preparation of training materials that accurately describe the statutory and regulatory requirements.  Furthermore, and importantly, the Court is ever mindful that, at bottom, the process of revising the Lesson Plan to conform with the INA and its regulations is quintessentially the agency's responsibility, and not this Court's.  *Cf. Regents*, 140 S. Ct. at 1914 (noting that making "difficult decision[s]" concerning policy matters is the "agency's job").  This means that it would be less than prudent under the circumstances presented in this case for the Court to undertake its *own* amendment process, by identifying and striking only certain portions of the Lesson Plan; rather, given the

integrated nature of the unlawful provisions and the lack of any indication that USCIS intended for any portion to be severable, the better course of action is for the Court to vacate the entire document, and thereby facilitate the agency's own decisionmaking processes concerning the necessary revisions.  *See, e.g.*, *ACA Int'l v. F.C.C.*, 885 F.3d 687, 708 (D.C. Cir. 2018).

3.    <u>Plaintiffs Are Entitled To New Credible Fear Determinations</u>

Lastly, this Court has determined that vacatur of the Lesson Plan is not sufficient to redress Plaintiffs' injuries fully, and that "specific injunctive relief" is necessary for each individual Plaintiff (Pls.' Reply at 40), for several reasons.

First, the instant circumstances satisfy the familiar four-factor test for injunctive relief.  *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (holding that a grant of injunctive relief requires consideration of the plaintiff's irreparable injury, the adequacy of the remedies available at law, the parties' balance of hardships, and the public interest).  Plaintiffs' sworn declarations establish the potential for irreparable injury, insofar as they detail the rapes, beatings, shootings, and family deaths that Plaintiffs experienced previously in their countries of origin and might experience again in the future if their asylum applications are not re-evaluated in accordance with the standards that the law prescribes, and if they are removed pursuant to such procedurally defective credible fear determinations.  (*See* Exs. B–G to Pls.' Mot., ECF No. 36-3, at 79–111.)  It is also sufficiently clear that, "without an injunction, the plaintiffs previously removed will continue to live in fear every day, and the remaining plaintiffs are at risk of removal."  *Grace I*, 344 F. Supp. 3d at 146, *aff'd in relevant part*, *Grace II*, 965 F.3d 883.  In other words, an order vacating the Lesson Plan and declaring it

unlawful would provide only partial relief to Julia and Sofia, who have already been removed, and to Kiakombua, Ana, and Emma, who seemingly remain subject to unlawful removal orders.  The balance of the hardships favors injunctive relief for Plaintiffs' benefit as well, because the government "cannot suffer harm from an injunction that merely ends an unlawful practice[.]"  *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).  And the Supreme Court has further recognized that, although there is "a public interest in prompt execution of removal orders[,]" there also "is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm."  *Nken v. Holder*, 556 U.S. 418, 436 (2009).  Thus, this Court is satisfied that injunctive relief is proper.

Injunctive relief is also warranted because, given the Court's findings and conclusions regarding the unlawfulness of critical portions of the Lesson Plan and the need for vacatur of the entire document, "there is 'only one rational course' for the [a]gency to follow upon remand[,]" *Berge v. United States*, 949 F. Supp. 2d 36, 43 (D.D.C. 2013) (quoting *Am. Fed'n of Gov't Emps., AFL-CIO v. F.L.R.A.*, 778 F.2d 850, 862 n.19 (D.C. Cir. 1985)), which is to void the credible fear determination that were made with respect to each Plaintiff pursuant to the unlawful Lesson Plan, and to provide Plaintiffs with new credible fear determinations that do not apply the unlawful standards in that document.  As noted above, Defendants' argument that the Court lacks the authority to issue any kind of injunctive relief (*see* Defs.' Mot. at 65) relies on an interpretation of the INA that has been rejected on numerous occasions, by all levels of the federal judiciary.  *See, e.g.*, *R.I.L-R*, 80 F. Supp. 3d at 184 ("[W]here a petitioner

seeks to enjoin conduct that allegedly is not even authorized by the statute, the court is not enjoining the operation of the statute, and § 1252(f)(1) therefore is not implicated." (internal alternations, quotation marks, and citations omitted)); *see also Reno v. Am.- Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999) (noting that section 1252(f) only "prohibits federal courts from granting classwide injunctive relief against the operation of §§ 1221–1231"); *Grace II*, 965 F.3d at 907 (explaining that section 1252(f)(1) "places no restriction on the district court's authority to enjoin *agency action* found to be unlawful"). Thus, nothing in the INA prevents this Court from enjoining the agency to take certain actions to remedy prior unlawful agency conduct.

Notably, returning Plaintiffs Julia and Sofia (who have already been removed) to the status quo *ante* means that Defendants will have to facilitate the return of these Plaintiffs back to the United States, at no cost to Plaintiffs Julia and Sofia. *See, e.g., Grace I*, 344 F. Supp. 3d at 144 (holding that the Court has the authority to order the return of plaintiffs unlawfully removed, and doing so), *aff'd in relevant part*, *Grace II*, 965 F.3d at 909. Consistent with this Court's Order, these Plaintiffs must be afforded every opportunity to meet with a properly trained USCIS asylum officer, and they must be interviewed in accordance with the standards and requirements of the INA and its implementing regulations. And they must not be made to fear the burden of having to find the means of making the journey back to the United States border, or having to incur the financial costs involved. *Cf.* Order, *Grace v. Whitaker,* No. 18-cv-01853, ECF No. 105, at 3 (Dec. 19, 2018) (ordering "defendants to bring back into the United States, at no expense to plaintiffs, any plaintiff who has been removed pursuant to an expedited removal order prior to this Order").

94

With respect to Plaintiffs Kiakombua, Ana, and Emma, Defendants might opt to confirm (through the issuance of proper Notices to Appear) that these Plaintiffs have already cleared the credible fear hurdle, in lieu of providing new credible fear screenings.  However, if the agency determines that new credible fear interviews are required, these Plaintiffs' evaluations, too, must be fully consistent with the INA and its regulations, and thus must not rely in any way upon the now invalidated Lesson Plan or any of its unlawful provisions.  Only if each Plaintiff's circumstances are assessed anew pursuant to, and consistent with, all applicable statutory and regulatory requirements concerning the credible fear stage of the asylum application process will this Court's order enjoining Defendants to provide new credible fear determinations for Plaintiffs be satisfied.

## V.    CONCLUSION

The INA and the regulations that federal agencies have promulgated to govern the modern asylum application process plainly reflect "the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands[.]"  8 U.S.C. § 1521 note.  One manifestation of this policy is the statute's two-stage process for evaluating asylum eligibility in the expedited removal context, which includes an initial screening assessment of whether prospective asylum applicants have a credible fear of persecution in their home countries.  The credible fear evaluation is meant to be a "low bar" for the noncitizen, insofar as the interviewing officer need only determine that there is a significant possibility that the applicant would be eligible for asylum.  *Thuraissigiam*, 140 S. Ct. at 1965–67.  Yet, as explained in this Memorandum Opinion, USCIS's amended "Lesson Plan on Credible Fear of

Persecution or Torture" imports into the credible fear evaluation various standards and burdens that apply only to the second stage of the statutory scheme, and places burdens on credible fear interviewees that extend far beyond the reasonable boundaries of Congress's policy choices as reflected in the governing law.  Thus, the Lesson Plan qualifies as a written directive, guideline, or procedure that implements the expedited removal scheme in a manner that unlawfully diverges from the INA and its implementing regulations.  *See* 8 U.S.C. § 1252(e)(3)(A)(ii).

As a result, this Court concludes that the parts of the Lesson Plan that conflict with the INA and related regulations—identified in Section IV.C, *supra*—must be **DECLARED UNLAWFUL**.  Furthermore, because the unlawful parts are not severable from the remainder of the document, the Lesson Plan must be **VACATED** in its entirety, and the matter remanded to the agency for further consideration in light of this Court's opinion.  In addition, as detailed in the accompanying Order, Defendants will be **ENJOINED** to void the credible fear determinations that were previously made with respect to each Plaintiff and to provide each Plaintiff with a new credible fear screening that does not rely in any respect on the unlawful policies in the vacated Lesson Plan.

DATE: October 31, 2020

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge